WATUPPA RESERVOIR COMPANY *vs.* CITY OF FALL RIVER.
TROY COTTON AND WOOLLEN MANUFACTORY *vs.* SAME.

Bristol.    March 23, 26, 1888. — October 29, 1888.

Present: MORTON, C. J., FIELD, DEVENS, W. ALLEN, C. ALLEN, HOLMES,
& KNOWLTON, JJ.

*Constitutional Law — Taking of Waters of Great Ponds for Public Uses
without Compensation.*

The Legislature, under the Colony ordinance of 1647, has the right to appropriate,
or to grant to a city or town the right to appropriate, the waters of great ponds
for domestic purposes, for the extinguishment of fires, and for other like munici-
pal or public uses, without making compensation for damages thereby occasioned
to the owners of land on such ponds, or on their outlets, by a substantial lessening
of the body of water.    W. ALLEN, C. ALLEN, & KNOWLTON, JJ., dissenting.

A company, composed solely of the owners of manufacturing establishments on
the only outlet of a great pond, and of the bed and the land on either side of the
stream, was incorporated, under the special act of 1826, c. 31, "for the purpose
of constructing a reservoir of water" in the pond, by erecting a dam across
such outlet, for the benefit of such establishments, and at great expense ac-
quired flowage rights all around·the pond, built the dam, raised the water, and
continued to maintain its reservoir.    The St. of 1886, c. 353, authorized a city
to take a certain quantity of the waters of the pond and apply them "to all
domestic uses, the extinguishment of fires, and to the public uses of the city,"
and "without liability to pay any other damages than the State itself would be
legally liable to pay."    The city duly took the water and proceeded to with-
draw from the pond a quantity, which substantially diminished the flow in the
stream and caused actual injury to the water power at such establishments.
*Held*, that the statute was not unconstitutional in making no provision for com-
pensation to such owners, or as impairing the obligation of a contract between
the Commonwealth and the reservoir company.    W. ALLEN, C. ALLEN, &
KNOWLTON, JJ., dissenting.

TWO BILLS IN EQUITY, filed in the Superior Court on May 23,
1887, to prevent the taking of water from a great pond by the
defendant city, as authorized by the St. of 1886, c. 353.*    The

---

* This statute, which was passed on June 30, 1886, is as follows:

" Section 1. The right is hereby granted to the city of Fall River to draw
daily from the North Watuppa Pond, not exceeding one million five hun-
dred thousand gallons of water, in addition to the amount of water already ·
condemned by said city under the provisions of chapter one hundred and
thirty-three of the acts of the year one thousand eight hundred and seventy-
one; and without liability to pay any other damages than the State itself

cases were heard together, by *Mason*, J., upon the bills, answers, and an agreed statement of facts, and were as follows.

The North Watuppa Pond is a great pond, situated near the city of Fall River, about four miles long and from three fourths of a mile to a mile and a quarter wide, fed by springs beneath it, the surface water from the surrounding land, and a few insignificant streams, and is connected by a narrow passage with the South Watuppa Pond, which is also a great pond.  In the body of the North Watuppa Pond there is no perceptible current whatever, but at or near the passage into the South Watuppa Pond there is generally a slight current toward the latter, which at times is reversed if a southerly wind is blowing.  Both of these ponds have always been freely used for fishing, fowling, boating, the cutting of ice, etc., by the public.  The Fall River, an unnavigable stream, is the only outlet of both ponds, receiving water from no other source, and flows out of the South Watuppa Pond, through the city, into Mount Hope Bay, with an average daily flow of twenty-six million gallons.  The descent of the river for a mile and a half of its course is gradual, but in the last half-mile it falls rapidly for one hundred and twenty-nine feet, down a succession of ledges, into the bay.  Upon the

would be legally liable to pay.  Parties holding in respect of said pond any privileges or grants heretofore made, and liable to revocation or alteration by the State, shall have no claim against said city in respect of water drawn under this grant; but no water shall be taken under this act until the city shall so elect by a vote of its city council, and shall have recorded a copy thereof in the registry of deeds for the northern district of the county of Bristol, and thereupon the quantity of water named in such vote shall be considered as taken and withdrawn from the waters of said pond for the purposes named in this act.

" Section 2.  Any privileges heretofore enjoyed in respect of said pond are, so far as they are inconsistent with this act, hereby annulled.

" Section 3.  The city of Fall River may apply the water taken under this act to all domestic uses, the extinguishment of fires, and to the public uses of the city; but this limitation shall not affect the use of one million five hundred thousand gallons of water daily, heretofore condemned by said city under the provisions of chapter one hundred and thirty-three of the acts of the year one thousand eight hundred and seventy-one.

" Section 4.  Any provisions in said chapter one hundred and thirty-three of the acts of the year one thousand eight hundred and seventy-one inconsistent with the provisions of this act are hereby repealed.

" Section 5.  This act shall take effect upon its passage."

Fall River there are valuable water privileges of an assessed value of $344,000, which have been utilized for power for many years, belonging to six or seven corporations, whose mills are built over the stream, and who own the bed thereof, and nearly all the land on either side from the head of the fall to tide water.

The Troy Cotton and Woollen Manufactory, one of such corporations, was the owner of the privilege nearest the ponds, and its dam, built by a predecessor in title in 1813, and maintained ever since, raised the natural level of the Watuppa Ponds three feet in height, and held back their waters.

The Watuppa Reservoir Company was incorporated under the special statute of 1826, c. 31,* for the purpose of constructing a reservoir of water in the Watuppa Ponds for the benefit of the manufacturing establishments on the Fall River, the owners of such establishments and privileges being the sole members of the company, and owning all of its capital stock. In 1827 the company built a dam at great expense across the river, below that of the Troy Company, of such height as to flow the pond two feet higher than that dam, and acquired, by the expenditure of large sums of money, rights of flowage as high as its dam all around both ponds, and on both sides of the

---

* The St. of 1826, c. 31, entitled " An Act to incorporate the Watuppa Reservoir Company," and approved on June 20, 1826, is as follows:

" Section 1. Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, that David Anthony, Nathaniel B. Borden, Oliver Chase, and Bradford Durfee, and their associates, successors, and assigns, be, and they hereby are, constituted a corporation and body politic, by the name of the Watuppa Reservoir Company, for the purpose of constructing a reservoir of water in the Watuppa ponds, so called, in the town of Troy, in the county of Bristol, for the benefit of the manufacturing establishments on Fall River; and for this purpose shall have all the privileges and immunities, and be subject to all the duties and requirements, contained in an act passed on the third day of March, in the year of our Lord one thousand eight hundred and nine, entitled ' An Act defining the general powers and duties of manufacturing corporations,' and the several acts in addition thereto.

" Section 2. Be it further enacted, That said corporation shall have power to make reserves of water in the Watuppa Ponds, so called, by erecting a dam across the outlet of said ponds, in the town of Troy, in the county of Bristol, so as to raise the water in said ponds two feet higher than the dam already erected by the Troy Cotton and Woollen Manufactory in said town of Troy, and to draw off said reserved water in such quantities, at such

river above it, and still continues to maintain the reservoir so formed, and still, with few exceptions, owns and exercises these rights of flowage. The expenses of the company are met by assessments upon its members, who are the successors in title of its original members, for whose benefit exclusively it is maintained, and it derives no income from the waters which it controls.

In 1871 the defendant city, as authorized by the St. of 1871, c. 133, took one and a half million gallons daily of the waters of the North Watuppa Pond for the purpose of providing its inhabitants with pure water, and paid to the owners of the manufacturing establishments on the Fall River over $50,000 for damages caused by such taking.

In 1886 the Legislature passed an act (St. 1886, c. 353) granting to the defendant city the right to take an additional million and a half gallons daily of the waters of the North Watuppa Pond for all domestic uses, the extinguishment of fires, and for the public uses of the city, without liability to pay any damages other than the State would be legally liable to pay, upon condition that the city, before taking the water, should pass a vote by its city council, and record it in the registry of deeds, stating the quantity to be taken and withdrawn. The city council, on November 1, 1886, passed the requisite

---

times, and in such manner, as they shall judge to be most for the interest of all concerned.

" Section 3. Be it further enacted, That the said corporation is authorized to acquire, by purchase or otherwise, and to hold and possess such real estate, not exceeding in value ten thousand dollars, and such personal estate, not exceeding in value five thousand dollars, as may be necessary to effect the purposes aforesaid.

" Section 4. Be it further enacted, That the capital stock of said corporation shall be divided into one hundred shares, to be held, assessed, and alienated agreeably to the by-laws of the corporation; and said by-laws shall not be adopted nor amended without the unanimous consent of all the proprietors, anything contained in an act entitled ' An Act defining the general powers and duties of manufacturing corporations ' to the contrary notwithstanding.

" Section 5. Be it further enacted, That if said corporation, in effecting the purposes aforesaid, shall become liable for damages to any person by flowing, such damage shall be ascertained, and shall be paid by said corporation, according to the provisions of an act entitled ' An Act for the support and regulation of mills,' and the several acts in addition thereto."

vote, which, on November 6, 1886, was duly recorded in the registry of deeds, by which the city took the quantity of water provided for in the act from the North Watuppa Pond, in addition to that taken by it under the act of 1871.

The city thereupon proceeded to draw, and is now drawing, from the pond a portion of the waters so taken, and contends that it has the right so to do without payment of any compensation to the plaintiffs, and that the Reservoir Company and the manufacturing establishments on the Fall River have no rights or privileges in the same as against the city. The amount of water taken under such vote, and actually withdrawn from the pond, substantially diminishes the flow of the stream, and causes substantial injury to the water power at each privilege, and amounts so far in all to about 1,700,000 gallons daily on an average. The city derives a revenue from the water drawn under both statutes, which is applied to the payment of the expense of running the water-works. There has always been a deficit in such expenses, decreasing from year to year, in which is reckoned interest on the outlay, which has been met by appropriations by the city. These appropriations pay for large quantities of water used by the city for extinguishing fires, watering streets, flushing sewers, and in the engine-houses, school-houses, and other public buildings belonging to or used by the city; and the cost to the city of this water is probably less than the rates charged to other consumers.

The judge ordered the bills to be dismissed; and the plaintiffs appealed to this court.

The cases were argued at the bar in March, 1888, and afterwards were submitted on the briefs to all the judges.

*J. M. Morton*, for the plaintiffs.

*J. F. Jackson*, for the defendant.

MORTON, C. J. These cases present an important question, not merely on account of the amount involved, but because it affects the rights of the Commonwealth in all the great ponds within its borders.

The St. of 1886, c. 353, § 1, provides: " The right is hereby granted to the city of Fall River to draw daily from the North Watuppa Pond, not exceeding one million five hundred thousand gallons of water, in addition to the amount of water already con-

demned by said city under the provisions of chapter one hundred and thirty-three of the acts of the year one thousand eight hundred and seventy-one; and without liability to pay any other damages than the State itself would be legally liable to pay. Parties holding in respect of said pond any privileges or grants heretofore made, and liable to revocation or alteration by the State, shall have no claim against said city in respect of water drawn under this grant." It is plain that it is the purpose of this statute to assert the right of the State to use the waters of the great ponds for public purposes, and to confer upon cities and towns the right so to use the waters, without making compensation to the littoral proprietors, or to those owning land or water privileges upon any stream flowing from the pond who may be damaged by such use. In the case before us, a natural stream, not navigable, known as the " Fall River," flows from the Watuppa Ponds into tide waters, having a fall in the whole of about one hundred and thirty feet, divided into a succession of water privileges, which are of great value. The city has proceeded, under the statute above cited, to take the waters of the pond, and it is admitted that the water withdrawn substantially diminishes the flow of the stream, and causes substantial injury to the water power at such privileges.

The question is thus presented, whether the State can constitutionally authorize a city or town to use the waters of a great pond for public purposes, without making compensation for damages inflicted upon the owners of land or privileges upon a stream flowing from it. The answer to it must depend upon the nature of the ownership or interest which the State has in the great ponds and their waters, and upon the character and limitations, if any, of the title of such owners of land on such stream. The record in this case merely states that the plaintiffs and the several corporations interested own the land on both sides of the Fall River. It does not show how or when they or their predecessors acquired their titles.

Originally, by grant from the king, the title to all the lands, including the great ponds within their boundaries, was in the Colony of Plymouth and the Colony of Massachusetts Bay, and after the Province charter was, unless previously parted with, in the Province of Massachusetts Bay, and after the Revolution

was in the State. Therefore the predecessor in title of the plaintiffs and of the owners upon the Fall River must have derived their title either from the Colony of Plymouth, or from the Province of Massachusetts Bay, or from the State. There is nothing to show, and it is not claimed, that they have any grant which conveyed to them the title to the ponds or the waters thereof. We believe only one instance is known in which a great pond has been conveyed to individuals, that of Humfrey's Pond, situated in Lynnfield and Danvers. *Commonwealth* v. *Roxbury*, 9 Gray, 451, 528, note. *West Roxbury* v. *Stoddard*, 7 Allen, 158.

If an individual owns a pond which has a natural stream flowing from it, the land bordering on which is owned by others by a title in fee without any limitations, it may be that he cannot lawfully fill up the pond, or divert its waters by artificial channels or conduits, to the substantial injury of those who own land on the stream. Where lands border upon a natural stream, each of the proprietors owns the fee to the thread of the stream, and has a right to the natural flow of the stream, subject to the right of every other proprietor to make such use of the water as it passes through his land as is not unreasonably injurious to all the others who with himself have a common right in the stream. Each proprietor has the right to the benefit of it as it passes through his land for all the useful purposes to which it may be applied, and no proprietor above or below has the right unreasonably to divert, obstruct, or pollute it. *Johnson* v. *Jordan*, 2 Met. 234. *Elliot* v. *Fitchburg Railroad*, 10 Cush. 191. *Cummings* v. *Barrett*, 10 Cush. 186. *Tyler* v. *Wilkinson*, 4 Mason, 397. But where a man owns a pond, and the whole of the stream flowing from it, he would probably have the right to divert and use the waters, although it sensibly diminishes the natural flow of the water in the stream, and if he sells the land on the stream he can reserve to himself the right so to divert and use the waters.

Without going into details, this is a brief statement of the rights of private individuals in ponds and streams. But the right of the Commonwealth is of a different nature.

The Colonies and the Province derived their rights from the king, under their several charters. These charters vested in the grantees not only the right of soil, but also large powers of

government and the prerogatives of the crown in the sea-shores, bays, inlets, rivers, and other property which were held for the use and benefit of all the subjects.    As stated by Chief Justice Shaw, the effect of the charters was " to grant to the company both the *jus privatum* and the *jus publicum* of the crown; the *jus privatum*, or title to the land, to be held in fee, parcelled out to corporations and individuals, to be held in fee, subject to the rules of the common law, as private property; and the *jus publicum*, or all those rights of the crown in the sea, sea shore, bays and arms of the sea, where the tide ebbs and flows, in trust for public use of all those who shall become inhabitants of said territory and subjects of said government."    *Commonwealth* v. *Roxbury*, 9 Gray, 451, 483.    *Commonwealth* v. *Alger*, 7 Cush. 53. These rights and powers, both the *jus privatum* and the *jus publicum*, to the extent to which they existed either in the king or Parliament, vested in the Colonial and Provincial governments, and after the Revolution vested in the Commonwealth, including all the prerogatives and rights of the crown, and powers of regulation which had at any time previously been held and exercised by the government of England.    *Commonwealth* v. *Alger*, 7 Cush. 53.

The Colony ordinance of 1641–1647 provides that " every inhabitant who is an householder shall have free fishing and fowling in any great ponds, bays, coves and rivers so far as the sea ebbs and flows within the precincts of the town where they dwell, unless the freemen of the same town or the General Court have otherwise appropriated them.    Provided, that no town shall appropriate to any particular person or persons, any great pond, containing more than ten acres of land, and that no man shall come upon another's propriety without their leave, otherwise than as hereafter expressed.    The which clearly to determine, it is declared that in all creeks, coves, and other places about and upon salt water, where the sea ebbs and flows, the proprietor, or the land adjoining, shall have propriety to the low water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further, provided, that such proprietor shall not by this liberty have power to stop or hinder the passage of boats or other vessels in or through any sea, creeks or coves to other men's houses or lands.    And

for great ponds lying in common, though within the bounds of some town, it shall be free for any man to fish and fowl there, and may pass and repass on foot through any man's propriety for that end, so they trespass not upon any man's corn or meadow." Anc. Chart. 148.

This is now generally spoken of as the Colony ordinance of 1647, although parts of it were enacted in different years. It has continued in force through the Provincial and State governments, except that recent legislation has made some changes as to the rights in great ponds, which do not affect the question before us. St. 1869, c. 384 (Pub. Sts. c. 91, §§ 10, 11). St. 1888, c. 318. And it is in force throughout the whole territory of this State, including those parts which were formerly the Colony of Plymouth, Nantucket and Dukes County, and also in Maine, although none of these were under the jurisdiction of the Colony of Massachusetts Bay. *Barker* v. *Bates,* 13 Pick. 255. *Mayhew* v. *Norton,* 17 Pick. 357. *Weston* v. *Sampson,* 8 Cush. 347.

It is true that it did not extend to these places by any positive enactment now known, passed after the union of the Colonies under the Charter of 1692, but it has been universally accepted and regarded as establishing a rule of property throughout the State. As stated by Chief Justice Shaw in *Barker* v. *Bates,* " Though the rule in question cannot be traced to this source, as a rule of positive law, we are of opinion that it is still a settled rule of property in every part of the State and founded upon a basis quite as firm and immovable; that being a settled rule of property, it would be extremely injurious to the stability of titles, and to the peace and interest of the community, to have it seriously drawn in question." The cases we have cited deal with questions as to the title and rights to the sea-shore; but the laws of Massachusetts from the earliest times have regarded the rights of the public in the great ponds as similar to their rights in the sea-shore. *Drury* v. *Natick,* 10 Allen, 169, 179. *Commonwealth* v. *Roxbury,* 9 Gray, 451. *Paine* v. *Woods,* 108 Mass. 160, 169. The ordinance dealt with the subject of the great ponds as well as with the sea-shore, and it established a rule of property as to their ownership and uses.

Although fishing and fowling are the only rights named in the ordinance, it has always been considered that its object was to set apart and devote the great ponds to public use, and that " with the growth of the community, and its progress in the arts, these public reservations, at first set apart with reference to certain special uses only, become capable of many others which are within the design and intent of the original appropriation. The devotion to public use is sufficiently broad to include them all, as they arise." *West Roxbury* v. *Stoddard*, 7 Allen, 158.

Under the ordinance, the State owns the great ponds as public property, held in trust for public uses. It has not only the *jus privatum*, the ownership of the soil, but also the *jus publicum*, and the right to control and regulate the public uses to which the ponds shall be applied. The littoral proprietors of land upon the ponds have no peculiar rights in the soil or in the waters, unless it be by grant from the Legislature. *Hittinger* v. *Eames*, 121 Mass. 539. *Gage* v. *Steinkrauss*, 131 Mass. 222.

The power of the Legislature to regulate the rights of fishing, and other public rights, is very broad. Thus it may regulate the time and manner of fishing in the sea within its limits, and may grant exclusive rights of fishing. Instances of the exercise of this power in regard to the great ponds are found in the various statutes leasing such ponds to individuals, which have been held to be valid, although they grant exclusive rights to individuals and exclude others from the exercise of rights to the use of the ponds to which they were before entitled. *Commonwealth* v. *Vincent*, 108 Mass. 441. *Commonwealth* v. *Tiffany*, 119 Mass. 300. *Cole* v. *Eastham*, 133 Mass. 65.

In view of the rights and powers of the State in and over the great ponds, it seems clear that the rights of proprietors owning land either on the pond or on any stream flowing from it cannot be decided by the rules of the common law applicable to ordinary streams. They must be determined with reference to the ordinance and the rule of property established by it, and we are of opinion that they must be regarded as subordinate and subject to the paramount rights of the public declared by the ordinance. All who take and hold property liable to be affected by this rule of property take and hold under and in subordination to it. Each grant carries with it an implied reservation of

these paramount rights, unless the terms of the grant exclude such reservation ; so that the grant from the State of land upon a stream flowing from a great pond did not convey an unqualified fee with the right to enjoy the usual and natural flow of the stream, but a qualified right, subject to the superior right of the State to use the pond and its waters for other public uses, if the exigencies of the public for whom it holds the pond in trust demand it.

The case of *Fay* v. *Salem & Danvers Aqueduct*, 111 Mass. 27, is similar to the case at bar.   In that case the defendant was an aqueduct corporation to which the Legislature had granted the right to draw water from a great pond, providing for the payment of damages suffered by any one from the taking of the water.   The plaintiff was a littoral proprietor, and claimed that his house was rendered uncomfortable and unfit for the purposes for which it was designed.   But the court held that he could not recover damages for this, as he had no right in the pond or its waters, and because, as stated in the opinion, " great ponds are public property, the use of which for taking water or ice, as well as for fishing, fowling, bathing, boating, or skating, may be regulated or granted by the Legislature at its discretion."

In the cases at bar, by the act of 1886, the Legislature authorizes the city of Fall River to draw daily one million five hundred thousand gallons of water from the North Watuppa Pond, and to " apply the water taken under this act to all domestic uses, the extinguishment of fires, and to the public uses of the city."   These are all public purposes.   The Legislature, acting on the conviction that an abundant supply of pure water to the people is of paramount importance, has deemed it to be a wise public policy to appropriate the waters of this pond to those public uses, without making compensation to those who, owning land on the natural stream flowing from it, have been accustomed to use the water for power as it flows through the stream.   Such owners have no vested rights in the waters of the pond, and a majority of the court is of the opinion that the Commonwealth may thus appropriate the waters by its direct action, or may authorize a city or town to do so, without being legally liable to pay any damages to the littoral owners on the pond or on the stream.

As this case depends upon the effect of the Colony ordinance, the decisions in England cannot be of assistance to us. They depend upon the common law, which, as we have said, is changed by the ordinance. The same may be said of the decisions in the other States of this country, most of which are governed by the rules of the common law. In New York and Pennsylvania, it has been held that the rules of the common law do not apply to such great navigable streams as the Hudson, Mohawk, and Delaware Rivers, though they may not be tidal rivers throughout; that the title of such streams is in the government in trust for the people; and that the State may use the waters, or authorize their use, for the purposes for which they are held in trust, without any compensation to riparian proprietors who are damaged by such use. *People* v. *Canal Appraisers*, 33 N. Y. 461. *Varick* v. *Smith*, 9 Paige, 547. *Carson* v. *Blazer*, 2 Binney, 475. *Shrunk* v. *Schuylkill Navigation Co.* 14 S. & R. 71. *Rundle* v. *Delaware & Raritan Canal Co.* 14 How. 80.

The industry of counsel has furnished us with references to between two and three hundred water acts passed by the Legislature, including some in which the right to use the waters of great ponds is granted, in most of which provision is made for compensation to those whose mill privileges or water rights are injured. These show that the policy of the State has heretofore been to provide such compensation, but they do not show that the State has not the power to use the waters without compensation. The act we are considering seems to mark a change in the public policy in regard to the waters of the great ponds, as since its enactment several other acts have been passed containing the same provisions as to damages.

The plaintiffs contend that the charter of the Watuppa Reservoir Company operated as a grant to the company of the right to use and control the waters of the Watuppa Ponds for the purposes of power, and for the benefit of the manufacturing establishments on the Fall River, of which it was and is composed. By its charter, this company was granted the "power to make reserves of water in the Watuppa Ponds, so called, by erecting a dam across the outlet of said ponds, in the town of Troy, in the county of Bristol, so as to raise the water in said ponds, two feet higher than the dam already erected by the Troy

Cotton and Woollen Manufactory in said town of Troy, and to draw off said reserved water in such quantities, at such times, and in such manner, as they shall judge to be most for the interest of all concerned." St. 1826, c. 31. We do not think that this can be construed as granting any part of the pond, or any absolute and exclusive right to use and control the waters of the pond. It does not do this in terms or by necessary implication. It is a familiar rule, that grants made by the government are to be construed in favor of the grantor, and this is especially true when they affect the interests of the people which are held in trust by the government. The State is not presumed to grant away such rights or franchises unless it is done in clear terms, or by an implication which is strictly necessary. *Commonwealth* v. *Roxbury*, 9 Gray, 451. *Martin* v. *Waddell*, 16 Pet. 367, 411. *Susquehanna Canal Co.* v. *Wright*, 9 Watts & Serg. 9.

The charter does not grant the pond or the waters in it. The right to use the surplus water is of value, though it is held subject to any future use the State may make of the pond. There is no necessary implication of a grant of the exclusive use of the waters. The charter gives a right to raise the level of the pond, and to use the water as it flows from it, but there is nothing to indicate the intention of the State to grant away the public rights in the pond. Whether it be construed as a revocable license or as a grant of a vested right, the company took and holds its rights subject to the paramount right of the government to use the water for the public purposes for which it was held in trust. For these reasons, a majority of the court is of the opinion that these bills cannot be maintained.

*Bills dismissed.*

KNOWLTON, J. In these cases I am unable to agree with the majority of the court, and it seems proper that I should state the principles by which I think the decision should be governed. The cases bring in question the right of a riparian proprietor to the use of the water of a running stream. We have no concern with rights in the waters of great ponds except in connection with the contention that, through these ponds, water may be diverted from the streams below without compensation to the riparian owners. The usufruct of water in a watercourse is

inherent in the ownership of the land through which the water flows. It is often the principal element of value in the real estate of which it is a part. Lord Wensleydale says, in *Chasemore* v. *Richards*, 7 H. L. Cas. 349, 382 : " It has now been settled that the right to the enjoyment of a natural stream of water on the surface, *ex jure naturæ*, belongs to the proprietor of the adjoining lands, as a natural incident to the right to the soil itself, and that he is entitled to the benefit of it, as he is to all the other natural advantages belonging to the land of which he is the owner." Chief Justice Shaw, in *Johnson* v. *Jordan*, 2 Met. 234, 239, uses these words : " Every person, through whose land a natural watercourse runs, has a right, *publici juris*, to the benefit of it, as it passes through his land, to all the useful purposes to which it may be applied. . . . It is inseparably annexed to the soil, and passes with it, not as an easement, nor as an appurtenance, but as parcel." In *Gardner* v. *Newburgh*, 2 Johns. 162, 165, Chancellor Kent says : " A right to a stream of water is as sacred as a right to the soil over which it flows. It is a part of the freehold of which no man can be disseised but by lawful judgment of his peers, or by due process of law. This is an ancient and fundamental maxim of common right to be found in Magna Charta."

The permanent deprivation of this right is a taking or destruction of property, and a diversion of water from a stream, so as to prevent its running in its natural course, is within the constitutional provision for the protection of property. As against riparian proprietors below, not even the State can authorize it without a provision for their compensation. This doctrine rests upon a principle of universal law, recognized from the earliest times, not only in this country and in England, but in continental Europe. It is established by such a weight of authority that it is no longer fairly open to question. *Gardner* v. *Newburgh*, 2 Johns. 162, 165. *Clinton* v. *Myers*, 46 N. Y. 511. *Smith* v. *Rochester*, 92 N. Y. 463. *Pumpelly* v. *Green Bay Co.* 13 Wall. 166. *Harding* v. *Stamford Water Co.* 41 Conn. 87. *Cooper* v. *Williams*, 4 Ohio, 253. *Lee* v. *Pembroke Iron Co.* 57 Maine, 481. *Grand Rapids Booming Co.* v. *Jarvis*, 30 Mich. 308. *Arimond* v. *Green Bay & Mississippi Canal Co.* 31 Wis. 316. *Eaton* v. *Boston, Concord, & Montreal Railroad*, 51 N. H. 504.

*Trenton Water Power Co.* v. *Raff*, 7 Vroom, 335. *St. Helena Water Co.* v. *Forbes*, 62 Cal. 182.    *Hooker* v. *New Haven & Northampton Co.* 14 Conn. 146.

In Pennsylvania it is held that riparian proprietors take subject to a paramount right in the State to divert water for navigation, and perhaps for other purposes.    But the decisions of that State depend in part upon a construction of the original grants, which are said to have extended only to the banks of the great rivers, and they differ from those of England and of most of the other States.    *Rundle* v. *Delaware & Raritan Canal Co.* 14 How. 80.    *Shrunk* v. *Schuylkill Navigation Co.* 14 S. & R. 71. *Wilts & Berks Canal Navigation Co.* v. *Swindon Waterworks*, L. R. 9 Ch. 451.

But the right of the State to regulate the use by the public of the watercourses within its limits, and to control rivers for that purpose, is not involved in the cases at bar, for the Fall River is in no sense a navigable stream, and the acts complained of have no connection with navigation.

Apart from the Body of Liberties of 1641 and the ordinance of 1647, which I shall presently consider, neither an individual nor the State has any better right to divert water from the Fall River by drawing it from the Watuppa Ponds, than by drawing it from the river itself below the ponds; for the river and ponds are parts of a natural waterway, through which the water passes directly from its sources to the sea.    Together they constitute a single system and natural feature of the country, the preservation of whose form and identity is essential to the enjoyment of all the property bordering upon their waters.    As against riparian owners below, every reason which forbids the diversion of water from a swiftly flowing stream is equally strong to prevent diversion where the water moves more slowly on its way to its outlet.    And this has been distinctly adjudicated in cases of high authority, and, so far as I am aware, without contradiction.    *Gardner* v. *Newburgh*, 2 Johns. 162, 165.    *Clinton* v. *Myers*, 46 N. Y. 511.    *Smith* v. *Rochester*, 92 N. Y. 463. *Hebron Gravel Co.* v. *Harvey*, 90 Ind. 192.    *Dudden* v. *Guardians of the Poor*, 1 H. & N. 627.    *Howe* v. *Norman*, 13 R. I. 488.    *Schaefer* v. *Marthaler*, 34 Minn. 487.    *West* v. *Taylor*, 16 Oregon, 165.    See also *Cummings* v. *Barrett*, 10 Cush. 186.

It remains to inquire whether the Body of Liberties of 1641 and the ordinance of 1647 changed the common law as to the rights of riparian proprietors upon streams which are supplied in whole or in part by the waters of great ponds.   This legislation will be found in the edition of 1672 of the Colonial Laws, which has recently been reprinted in fac-simile by the city of Boston, and it appears under the title of " Liberties Common." Section 2 is as follows : " Every inhabitant who is an householder, shall have free fishing and fowling in any great ponds, bays, coves and rivers, so far as the sea ebbs and flows within the precincts of the town where they dwell, unless the freemen of the same town or the General Court have otherwise appointed them.   Provided, that no town shall appropriate to any particular person or persons, any great pond containing more than ten acres of land, and that no man shall come upon another's propriety without their leave, otherwise than as hereafter expressed. . . . And for great ponds lying in common, though within the bounds of some town, it shall be free for any man to fish and fowl there, and may pass or repass on foot through any man's propriety for that end, so they trespass not upon any man's corn or meadow."

The purpose of this legislation, which bears date 1641–1647, seems to have been to secure to all the people certain common rights in the great ponds, and to resident householders similar rights in the bays, inlets, and navigable rivers of the Commonwealth.   It contains nothing which, by implication even, seems intended to limit the right of riparian proprietors upon running streams to have the water flow in its natural course.   In construing it, we must consider the situation of the country at the time it was passed.   A large number of watercourses in this Commonwealth find their sources in great ponds.   Private grants must have been made upon some of these streams prior to 1641. Upon the construction of this legislation contended for by the defendant, it would have been unconstitutional as against these grants ; not indeed in violation of a written constitution, for there was none ; but it would have been contrary to the principles of right which lie at the foundation of all constitutions, and which were then as rigorously regarded as if they had been embodied in a written constitution.

Can it be supposed that our forefathers, zealous as they were in the encouragement of the erection of mills, intended by these provisions to take from individuals, without compensation, rights which they had acquired under previous grants to have water flow through their lands forever? Can it be supposed that, without express reference to the subject, they intended their legislation as an incumbrance upon all lands thereafter to be granted upon watercourses flowing from great ponds, such that the grantees would be liable at any time, at the will of the Colony, to have the character of their property wholly changed, and the beds of their streams left dry? On the contrary, it seems to me that these provisions looked to the preservation of the natural features of the country, and did not even hint at the creation by the Colony of a right in itself to deprive real property not referred to of elements of value naturally belonging to it. They dedicated the great ponds to the public. They gave to all the right of boating and fishing, and they reserved to the Colony the property in the ponds themselves, the better to regulate these and other kindred public rights for the common good.

Undoubtedly the State may use and control these ponds in any reasonable way for the preservation and regulation of these rights. But such use and control must not be inconsistent with the continued existence of the rivers and streams which have been accustomed to flow from them. Doubtless the State, as proprietor, may appropriate them to any other use which does not interfere with the ordinary rights of proprietors upon outlet streams along whose lands the waters flow. But as proprietor the State has no greater right than any other proprietor would have, as against the owners upon these streams; unless indeed its right of regulation and control, for the protection of public rights secured by the ordinance, be deemed an incident of ownership, and not merely of sovereignty. This view seems in harmony with all the numerous decisions which have dealt with the subject. *Commonwealth* v. *Alger*, 7 Cush. 53. *Cummings* v. *Barrett*, 10 Cush. 186, 188. *Commonwealth* v. *Roxbury*, 9 Gray, 451, 477, and 503, note. *West Roxbury* v. *Stoddard*, 7 Allen, 158. *Berry* v. *Raddin*, 11 Allen, 577. *Commonwealth* v. *Vincent*, 108 Mass. 441. *Fay* v. *Salem & Danvers Aqueduct*, 111 Mass. 27.

*Hittinger* v. *Eames*, 121 Mass. 539.   *Gage* v. *Steinkrauss*, 131 Mass. 222.   *Rowell* v. *Doyle*, 131 Mass. 474, 476.   *Attorney General* v. *Jamaica Pond Aqueduct*, 133 Mass. 361.   *Watuppa Reservoir Co.* v. *Fall River*, 134 Mass. 267.   *Potter* v. *Howe*, 141 Mass. 357.

*Fay* v. *Salem & Danvers Aqueduct*, 111 Mass. 27, which is relied on by the defendant, contains nothing inconsistent with it. In that case the petitioner sought to recover damages under the statute for an injury occasioned by the taking of water by an aqueduct corporation from a great pond, on the ground that his dwelling-house was thereby rendered uncomfortable, and unfit for the purposes for which it was designed.   His petition was dismissed on two grounds : one was that such an injury was too remote to be the subject of an assessment of damages under the statute, and the other that he had no private right of property in the pond.   It has been held in several of the above cited cases that the public, as well as the landowners along a great pond, may make a reasonable use of it for obtaining water, and for fishing, fowling, bathing, boating, and skating.   In other words, every member of the community who can gain access to it has the same rights in it that riparian proprietors commonly have in similar smaller ponds.   It was therefore decided that a landowner upon it, whose land comes only to the water's edge, has in it no separate right, but only a right as one of the public.   That which would otherwise be his private right is held to be merged in his public rights.   See *Lyon* v. *Fishmongers' Co.* L. R. 10 Ch. 679.

It follows, therefore, that when the Legislature grants those rights to an individual or a corporation, it does not deprive him of property.   He is presumed to have bought his land knowing that he could acquire no property in the pond, and trusting to the probable preservation of the public rights for his enjoyment of it.   But these decisions do not touch the question whether the owner of land upon a watercourse below can be deprived of water by diversion at the fountain head.

Mr. Justice Gray says in the opinion in the case of *Fay* v. *Salem & Danvers Aqueduct*, which we are considering, that the Legislature " had full authority to grant the right to an aqueduct corporation to take and conduct the water of the pond for the use of the inhabitants of towns in the neighborhood ; making

due compensation for any private property taken for this public use." But the cases I have cited show that depriving a riparian proprietor upon a running stream of the use of water, by diverting it at a pond above, is taking his property, within the meaning of those words in the Constitution. This very case, therefore, recognizes the constitutional requirement of compensation to those whose water rights are taken in this way. If we select from this case and from other cases the particular language most favorable to the defendant's contention, and consider it carefully, it will lead to the same conclusion. It is said that " the pond and the water therein belonged not to the petitioners, but to the public"; and there are other cases which hold that, under the ordinance, the property, or the ownership, or the title to the waters of great ponds and the land under them, is in the Commonwealth. But such language, reasonably interpreted, means that the ordinance secures to the Commonwealth, in great ponds, the same kind of ownership in the water that an individual purchaser of the entire area of a small pond would get by a perfect deed, or by an original grant from the government without restrictions.

If the small pond had no outlet, the purchaser's title to the water in it would enable him to use it in any way he might choose. The water in such a pond would permanently appertain to the locus, and would belong as entirely to the owner of the place in which it accumulated as the land itself by which it was supported. If his pond happened to be a link in a chain through which water made its course from the mountains to the sea, his ownership of the water would give him only the reasonable usufruct of it as it was passing by. He could not consume it, or put it out of visible existence, as he might the solid land within his purchase, because such a use of it would be inconsistent with the right of his neighbors to enjoy their real property in its natural state. In this view, in order to describe the quality of his ownership, it is sometimes said that a riparian proprietor has no title to the water itself of a running stream, but only to the usufruct of it. In a sense, that is true; in another sense, he has a perfect title to the water considered as water of a stream; for the property is real estate naturally moving in a defined course, and he has as good a title as it is

possible to have, in view of the nature of the subject to which his title relates.   Merely as an owner, and apart from the exercise of sovereignty, which has no relation to these cases, the Commonwealth could have no better.

No question has arisen in any of the cases which has made it necessary for the court to express an opinion as to the nature of the ownership of the Commonwealth in the waters of great ponds, whether hemmed in by continuous banks, or passing into streams on their way to farms or mills below.   The question under discussion in the last-named case was one which would have been pertinent to a pond without an outlet stream, the waters of which, if it had been a small pond, would have been absolutely owned by its proprietor.   I believe there is not an expression in any opinion upon this subject which gives countenance to the defendant's contention, unless it be held, as it has never hitherto been held, that, under the ordinance, the ownership or title of the Commonwealth in the waters of great ponds is larger than a private person could obtain by a perfect deed, or by an original unrestricted grant from the State, of a similar small pond, and, as applied to running waters in a pond, larger than is consistent with the nature of the property to which it relates.

In *Fay* v. *Salem & Danvers Aqueduct, ubi supra,* it is said of the water, that " the Legislature, and the respondents acting under their authority, had the right to take and draw it off for the public use."   But this was merely a statement of their right in reference to the petitioners, who had no rights in it, and not of a general right to take it without compensation as against riparian proprietors upon a stream below.   For not only is the necessity to make compensation for property so taken recognized in a former part of the opinion, but the statute under which the suit was brought provided for it, and the court expressly held, in an opinion by Chief Justice Bigelow in a former suit between the same parties, that the taking of this very water was an exercise of the right of eminent domain.   St. 1850, c. 273.   *Fay* v. *Salem & Danvers Aqueduct,* 9 Allen, 577.

It is common knowledge that, from the earliest times, rights in the water of streams flowing from great ponds have been regarded as no less perfect than those in other streams.   The

plaintiff's counsel has furnished us a list of two hundred and twenty-three different acts of the Legislature, authorizing municipalities or corporations to supply water for domestic use, passed prior to that under which the defendant now claims. Many of these authorized the taking of water of great ponds, and in none of them is such taking authorized without a provision for the payment of damages. I believe the cases between these parties to be the first in this Commonwealth in which it has been contended that water could lawfully be diverted from the wheels of a mill-owner by taking it from a great pond without the payment of damages.

Against the opinion and practice of our people in relation to rights in water for more than two hundred and fifty years, — against legislative interpretation of the law, frequently repeated and uniform until the passage of this act, — courts should hesitate long before establishing a doctrine which will deprive mill-owners and others of valuable property naturally inherent in their real estate. And, in my opinion, it is reading into the Body of Liberties and the ordinance of 1647 what is not written in them, to say that by them our fathers put an incumbrance upon property bordering upon streams in every part of the Commonwealth. It seems a much more natural and better construction of them, and one consistent with all the authorities, to hold that they were intended to preserve public rights, and not to subject landowners remote from great ponds to the possibility of a change in the natural features of their estates.

The taking of 1,500,000 gallons of water per day for sale to inhabitants of Fall River cannot be authorized as a regulation of public rights in the use of the pond. It is an act of an entirely different character from the direct use of the pond itself by the individuals composing the general public; and it is a substantial diversion of water from the river below. In respect to the principles applicable to it, it cannot be distinguished from a taking of all the water of the stream. The statute which assumes to authorize it declares negatively that the right is granted " without liability to pay any other damages than the State itself would be legally liable to pay," and it makes no provision for compensation to those whose property is taken. In my opinion, it is not in conformity with the Constitution, and

it gives the defendant no rights as against the riparian proprietors upon the river below.

The plaintiffs contend that, as against the charter of the Watuppa Reservoir Company, it is also unconstitutional, as impairing the obligation of a contract. I do not desire to discuss at length this branch of the case, and I do not wish to be deemed to have assented, by silence, to the view of it taken by the majority of the court. It is true that a grant from the sovereign power is to be construed strictly against the grantee. It is true that the sovereignty of the Commonwealth as a ruling power was not impaired by the charter granted to this corporation. It may also be conceded that the rights of property acquired by the corporation under its charter are subordinate to the rights of the public to use the ponds for fishing, boating, bathing, and other kindred purposes, and that the right of the Commonwealth to legislate for the protection and regulation of these public rights was not affected by the act of incorporation.

But the case finds that, acting strictly within the authority of its legislative grant, the corporation has, at great expense, erected a dam at the outlet of the ponds, raised the water, and maintained a reservoir for the purpose of using the water for power. It also finds that, under the same special authority, it has procured a title to lands to be flowed all around both ponds, and it appears that both its property right to this special use of the water granted by the State, and its property in the lands around the ponds, will be taken away, or greatly diminished in value, if the defendant is permitted to proceed and appropriate this water. It is a rule of law that, in transactions in relation to its property, not affecting its sovereignty, the Commonwealth is bound by its contracts, like an individual. In such dealings, it voluntarily lays aside its sovereignty.

The right to regulate the business or repeal the charters of certain corporations, reserved in the act of March 3, 1809, to which this charter is made subject, and the similar right in the broader statute of 1831, c. 81, (Pub. Sts. c. 105, § 3,) have their limitations. In dealing with the latter statute, Chief Justice Shaw, in *Commonwealth* v. *Essex Co.* 13 Gray, 239, 253, says: " The rule to be extracted is this ; that where, under power in a charter, rights have been acquired and become vested, no

amendment or alteration of the charter can take away the property or rights which have become vested under a legitimate exercise of the powers granted." I am not aware that this proposition of law has ever been controverted; and there are similar intimations or statements in numerous cases in our reports, and in those of the Supreme Court of the United States. *Commonwealth* v. *New Bedford Bridge*, 2 Gray, 339, 348. *Commissioners on Inland Fisheries* v. *Holyoke Water Power Co.* 104 Mass. 446, 451. *Parker* v. *Metropolitan Railroad*, 109 Mass. 506, 508. *Binghamton Bridge*, 3 Wall. 51. *Holyoke Co.* v. *Lyman*, 15 Wall. 500, 522.

There is great force in the argument, that, by the acts of the corporation under its charter, the contract of the Commonwealth has become executed, and that the rights of the corporation have become vested, so that they cannot be taken away without compensation, — at least so long as the charter remains unrepealed.

I am requested to say that Mr. Justice William Allen and Mr. Justice Charles Allen concur in this opinion.