ATTORNEY GENERAL vs. REVERE COPPER COMPANY.

Suffolk.    January 22, 1890. — November 3, 1890.

Present: FIELD, C. J., DEVENS, W. ALLEN, C. ALLEN, & KNOWLTON, JJ.

*Great Pond — Prescription — Statute of Limitations — Public Nuisance.*

Under the Colony ordinance of 1647, providing that "no town shall appropriate
to any particular person or persons any great pond containing more than ten
acres of land," a deed made in 1770 by the proprietors of a town to an indi-
vidual, and purporting to convey a great pond within its limits, is invalid.

A prescriptive right to lower the waters of a great pond below low-water mark
might be gained by an individual after the enactment of the Rev. Sts. c. 119,
§ 12, which made the statute of limitations of real actions applicable to suits
brought by the Commonwealth; and the amendatory St. of 1867, c. 275, which
excepted from such application suits relating, among other things, to the Com-
monwealth's title in great ponds, did not operate to divest such prescriptive
rights already acquired.

The rule that no length of time will legalize a public nuisance does not apply
where no other nuisance exists than an abridgment of the public's enjoyment
of property, such as a great pond, by the long continued use of some part of it
by an individual under a claim of right, in the way a private owner would
ordinarily use it, and where a statute exists permitting the acquisition by dis-
seisin of a complete title thereto against the State.

INFORMATION filed July 7, 1885, to prevent the lowering of
the waters of Massapoag Pond, a great pond in Sharon. Hear-
ing upon the pleadings and a master's report, before *Devens*, J.,
who reserved the case for the consideration of the full court, in
substance as follows.

Massapoag Pond, which contains about four hundred and fifty
acres, is situated in the town of Sharon, and has for an outlet
a brook of the same name, which flows through Canton into the
Neponset River.    This pond was covered by the grant made by
the Colony of Massachusetts Bay, on November 20, 1637, to
the proprietors of Dorchester, being included in that part of
Dorchester called Stoughtonham.    The proprietors of Dorches-
ter and Stoughton, on June 11, 1770, attempted to convey the
entire pond to Edmund Quincy by a deed, describing it as
" being bounded on all parts with a former grant of the said
proprietors of a publick way round the same next to the bank
or edge of said pond."    Quincy thereupon took possession of

the pond and deepened the outlet and lowered the water in the pond to get at the iron ore in the bottom thereof; and such ore was taken out of the pond from that time until 1825, but no later. The defendant, a manufacturing corporation, derived title to the pond in 1845 by mesne conveyances from Quincy. It was also the owner of five mill sites and privileges, besides an interest in a sixth, upon the outlet of the pond, the lowest of these, upon which its works were located, being known as the powder-mill site and privilege, and that nearest the pond as the knife-works site and privilege. All the land on both sides of the outlet, and the outlet itself between the pond and the knife-works privilege, also belonged to the defendant.

On February 20, 1776, Samuel Briggs, Jr., then the owner of the powder-mill site and privilege, by a warranty deed conveyed it to the Colony of Massachusetts Bay; and on April 17, 1779, the Great and General Court of the State of Massachusetts Bay, conveyed the same, being " land which consists of part upland and part mill-pond and stream of water, across which stream there is now a dam erected," to Samuel Osgood, " with the appurtenances, privileges, and commodities thereof," the deed declaring that in times of scarcity of water the grantee or his servants might draw the gates in any dam that might be built up-stream, " and draw the water to forward the business of said Osgood hereafter, forever." The defendant derived its title to this site and privilege by mesne conveyances from Osgood.

The defendant's predecessors in title, beginning with Quincy in 1770, had dug out and maintained below low-water mark a trench reaching from the head of the outlet into the pond, which was extended by diverging artificial channels still farther into the pond. It was necessary to clean out these channels as they gradually filled up, and this was done every three or four years as late as 1884, to admit of lowering the water in the pond to the desired point. They also deepened the channel of the brook, walled up the sides thereof, and converted it into a flume. Before 1815 a large timber called a mud-sill, below the level of the top of which no water could be drawn from the pond, was placed across the bottom of this trench; and in 1825 this sill was lowered a few inches to a point where it has since remained. From as early as 1794 until as late as 1836, the flow from the

pond into the outlet was regulated by means of flash-boards, but in that year the defendant built a gate-house over the flume, and since that time has by means of a gate controlled the flow of the waters of the pond, as required by the needs of its various privileges on the stream below.

The master found that the defendant had a good record title " to the whole of the water of the pond, the soil in the bottom and around a large part of the margin of the pond, the soil where the artificial channels and the gate-house are, including the whole outlet whereon digging has been done affecting the lowering of the water, and the premises whereon is the gate-house by which the flow of the water is controlled; and of the whole brook and land bordering thereon continuously for more than a hundred rods from the gate down to and including the knife-works privilege "; that "since 1825 the defendant and its predecessors in title have, under a claim of right, continuously, peacefully, exclusively, — except as hereinafter stated, — and without lawful interruption up to the time of the filing of this information, possessed and controlled and regulated the water and the flow of water from this pond, have maintained the water at such height as they pleased, and have drawn it to a depth of three feet and ten inches below natural low-water mark when and as they pleased, and have entered the pond and dug and cleaned out the channels as hereinbefore stated whenever they pleased; . . . that, in thus lowering the waters of the pond, the area of surface and quantity of water had been diminished, and thereby the limits of enjoyment by the public in the rights of bathing, boating, fishing, and cutting ice, if any they had, have been abridged ; . . . that, other than as aforesaid, the defendant has not excluded nor sought to exclude the public from bathing, boating, fishing, fowling, or cutting ice on the pond, but that the public have to some extent at any and all times used and enjoyed these privileges without let or hindrance."

The pond is a shallow one, the shore running out at a slight decline, in many places two hundred to three hundred feet, after which the slope of the bottom is more abrupt, so that lowering the water three feet and ten inches below the natural low-water mark exposes an area of shore varying from a few feet to at least one hundred feet in a few places.    The surroundings

of the pond are by nature beautiful and attractive to summer visitors and residents, and the lowering of the water in the autumn by reducing the area and depth of water abridged the enjoyment of boating upon the pond. By the words "except as hereinafter stated," the master referred to a lease of the pond to the town of Sharon, on March 15, 1880, for ten years, without objection on the defendant's part, and with the knowledge of its president, who "joined in stocking the pond with fish, and received a license permitting him and the members of his family to fish therein." There was evidence before the master of offensive odors arising from the shores of the pond, due mostly to decaying vegetable matter, but he found that "the evidence as a whole has failed to show the existence of odors detrimental to the public health, or continuously or materially offensive, or that the odors were caused by lowering the pond three feet ten inches below original low-water mark." The master also found that there were in all eleven mill sites and privileges on the brook, with an invested capital of about $1,800,000.

*R. M. Morse, Jr. & T. E. Grover,* (*M. Morton, Jr.* with them,) for the plaintiff.

*H. G. Parker,* for the defendant.

KNOWLTON, J. The defendant owns the land on both sides of the stream which flows from Massapoag Pond, and maintains a flume and gate at the outlet of the pond, and regulates the flow of water by holding it back or letting it down to be used for power in running its mills on the stream below, and at times lowers the surface of the water in the pond to the depth of three feet and ten inches below the lowest point at which it would stand if left in its natural condition.

The defendant shows an unbroken chain of title running back to the grant from the Colony to the proprietors of Dorchester in 1637, and the first question in the case is, whether it has a right by deed to lower the waters of the pond as it has been accustomed to do. We will assume, without deciding, that the title to the pond passed to the original proprietors of Dorchester in 1637. *Commonwealth* v. *Roxbury,* 9 Gray, 451. *West Roxbury* v. *Stoddard,* 7 Allen, 158. It had not been conveyed to any private person at the time of the adoption of the Body of Liberties, in 1641, which secured to the public rights of fishing in great

ponds, or at the time of the passage of the Code of 1649. By
that Code, as appears by the compilation of 1660, it was pro-
vided "that no town shall appropriate to any particular person
or persons any great pond containing more than ten acres of
land, . . . and for great ponds lying in common, though within
the bounds of some town, it shall be free for any man to fish
and fowle there, and may pass and repass on foot through any
man's propriety for that end, so they trespass not upon any
man's corn or meddow." Anc. Chart. 148. Colonial Laws,
1660–72, (Bostonre print of 1889,) pp. 37, 86, 170. The effect
of these provisions has often been considered by this court, and
it is held that the title to great ponds which had not previously
been granted is in the Commonwealth for the benefit of the pub-
lic, and, if a pond had previously been granted to a town, and
had not passed to a private person, the legal title remains in the
town, but the beneficial right is in the public. *Commonwealth*
v. *Roxbury*, 9 Gray, 451. *West Roxbury* v. *Stoddard*, 7 Allen,
158. *Watuppa Reservoir* v. *Fall River*, 147 Mass. 548.

The deed of the proprietors of Dorchester and Stoughton to
Edmund Quincy, dated June 11, 1770, so far as it purported to
convey the pond itself, was in violation of law, and of no effect.
Upon our assumption, the title to the pond remained in the town,
to be held for the public; if it was not in the town, it was in the
Commonwealth, and held in like manner for the public. The
deed of Samuel Briggs, Jr., to the Colony of Massachusetts Bay,
in February, 1776, and the deed from the Great and General
Court of Massachusetts Bay, in 1779, of the powder-mill site
and privilege now owned by the defendant, conveyed only the
ordinary rights of a riparian proprietor on a stream, together
with such privileges as were specified in the deeds, and they
gave no right to interfere at any time with the natural outflow
of water from the pond. The defendant shows no title by deed
under which it can lawfully control the water in the pond, or
draw it below the lowest level which it would reach if affected
only by natural causes.

The use on which the defendant relies to support its claim of
a right by prescription falls far short of establishing a title to
all the water of the pond, and a right to use it as the defendant
may choose. There has been no such exclusive use of the entire

pond, and no such control of it by the defendant, as is necessary to the acquisition of a title by disseisin.   But the master finds that, "since 1825, the defendant and its predecessors in title have, under a claim of right, continuously, peacefully, exclusively,—except as hereinafter stated,—and without lawful interruption up to the time of the filing of this information, possessed and controlled and regulated the water and the flow of water from this pond, have maintained the water at such height as they pleased, and have drawn it to a depth of three feet and ten inches below natural low-water mark when and as they pleased, and have entered the pond and dug and cleaned out the channels as hereinbefore stated whenever they pleased."   He finds " that, in thus lowering the waters of the pond, the area of surface and quantity of water has been diminished, and thereby the limits of enjoyment by the public in the rights of bathing, boating, fishing, and cutting ice, if any they had, have been abridged." He also finds " that, other than as aforesaid, the defendant has not excluded nor sought to exclude the public from bathing, boating, fishing, fowling, or cutting ice on the pond, but that the public have to some extent at any and all times used and enjoyed these privileges without let or hindrance."   It is also found that in 1770, Edmund Quincy, who held a deed from the town, lowered the water in the pond by permanently digging down the outlet under a claim of right to a depth a little less than its depth at present, and that from that time to 1825, in order to get iron ore from the bed of the pond, the water was drawn off at will through that outlet.   If the Commonwealth, representing the public, had no property or rights to be considered, these facts would show the acquisition by the defendant of a perfect prescriptive right to regulate and control the flow of water from the pond as it and its predecessors in title have been accustomed to do.   *Cary* v. *Daniels*, 8 Met. 466, 479.   *Pratt* v. *Lamson*, 2 Allen, 275, 278.   The question therefore arises whether such a right can be acquired against the public.

The rule of the common law was expressed by the maxim, *Nullum tempus occurrit regi.*   There was no statute of limitations against the sovereign power, and prescription did not run against the King.   This rule has been generally recognized by the American States, and it has been held that statutes of limita-

tion are not applicable to suits brought by a State, unless they are made applicable to them in terms. *Stoughton* v. *Baker*, 4 Mass. 521, 528. *Commonwealth* v. *Hutchinson*, 10 Penn. St. 466. *Bagley* v. *Wallace*, 16 S. & R. 245. *State* v. *Joiner*, 23 Miss. 500. *Brimfield* v. *Carter*, 2 Ga. 143. *Des Moines* v. *Harker*, 34 Iowa, 84. *People* v. *Gilbert*, 18 Johns. 227. *Cincinnati* v. *Evans*, 5 Ohio St. 594. The St. of 9 George III. c. 16, changed the law in England, and extended the statute of limitations to real actions brought by the King. Since the passage of that act, prescription has been pleadable there against the sovereign. The rule of the common law prevailed in Massachusetts until the enactment of the Revised Statutes in 1835, when, by section 12 of chapter 119, the statute of limitations of real actions was made applicable to suits brought by or in behalf of the Commonwealth. This section, with slight amendments, now appears in the Pub. Sts. c. 196, § 11. Under this statute a title by disseisin may be acquired against the Commonwealth as readily as against a private person, and, by analogy, there seems to be no good reason why prescriptive rights in the real estate of the Commonwealth may not also be acquired.

Although the adjudications on this subject are not numerous, there are many cases which seem to recognize the possibility of acquiring such rights. It has several times been held, not only that the title of a private owner of flats may be devested by disseisin, but that the rights of the public to use the water over the flats for navigation, boating, and fishing may in like manner be devested by long continued adverse use. *Nichols* v. *Boston*, 98 Mass. 39. *Tufts* v. *Charlestown*, 117 Mass. 401. *Eastern Railroad* v. *Allen*, 135 Mass. 13. Other cases assume that this is so. *Lakeman* v. *Burnham*, 7 Gray, 437. *Tappan* v. *Burnham*, 8 Allen, 65. It may be said that the cases in relation to the acquisition of public rights in flats by prescription do not show that similar rights can be acquired in great ponds, because the rights of the public in the waters over flats are subordinate to the right of the private owner reasonably to improve his land by excluding the public and building upon it, while in great ponds there is no private ownership. But if prescription will run against the public, it may avail to cut off public rights in great ponds as well as anywhere else. In *Nichols* v. *Boston, ubi*

*supra*, the rights acquired by prescription did not depend on the peculiarities of private ownership in flats. They extended below low-water mark, where the sole ownership and control was in the Commonwealth for the benefit of the public. In *Hittinger* v. *Eames*, 121 Mass. 539, the plaintiff claimed by prescription the right to prevent the public from cutting ice on a great pond. Although it was decided that he did not show such a use as to establish his claim, the opinion assumed without question that rights in great ponds could be acquired against the public by prescription, as well as by grant from the Legislature. Other cases in which the court seem to assume that rights adverse to the public may be acquired in great ponds by prescription are *Cowell* v. *Thayer*, 5 Met. 253 ; *Cummings* v. *Barrett*, 10 Cush. 186 ; *West Roxbury* v. *Stoddard*, 7 Allen, 158, 170, 171 ; and *Tudor* v. *Cambridge Water Works*, 1 Allen, 164. In the present case also the plaintiff's counsel assumes it, but contends that the facts are not sufficient to establish a prescriptive right. In *Watuppa Reservoir* v. *Fall River*, 147 Mass. 548, no question of this kind was presented by counsel, or considered by the court.

It is sometimes said that prescription will not run against a statute ; but this is not an accurate statement of the law. In England, where the laws are made by Parliament and grants of public property are made by the King, when there is an Act of Parliament forbidding grants of a particular kind, a title cannot be founded on the presumption of such a grant. *Goodtitle* v. *Baldwin*, 11 East, 488. *Rochdale Canal* v. *Radcliffe*, 18 Q. B. 287. *Mill* v. *New Forest Commissioner*, 18 C. B. 60, 69. The same principle applies in any case where a grant could not legally have been made. *Brookline* v. *Mackintosh*, 133 Mass. 215, 225. *Turner* v. *Fitchburg Railroad*, 145 Mass. 433, 436. *Mills* v. *Hall*, 9 Wend. 315. In this Commonwealth a statute which creates public rights in property is not inconsistent with the existence of a right in the Legislature at any time to grant away all or any of such rights. There is a strong presumption that a State will not devest itself of sovereignty and governmental control over any part of its territory; but there is no presumption that it will not, for a good reason, part with property which it holds for public use. It may grant that at any time, subject to

no greater limitations than those which would affect an individual owner of similar property. In the case at bar, the uninterrupted adverse exercise of a power to lower the water of the pond by the defendant and its predecessors in title may well give a prescriptive right, whether the legal title was in the Commonwealth or in the town. The grounds on which a grant may be presumed to have been made are not materially different from those in any other case of the acquisition of a right by prescription. *Scheuber* v. *Held*, 47 Wis. 340.

By the St. of 1867, c. 275, it was provided that the statute of limitations of real actions brought by the Commonwealth shall not apply " to any property, right, title, or interest of the Commonwealth below high-water mark or in the great ponds." Pub. Sts. c. 196, § 11. Since this modification of the statute of limitations, it is manifest that the statute cannot be set up in bar of a real action brought by the Commonwealth to recover a great pond, unless the defendant had acquired a title by disseisin before the passage of the amendatory act. But before the passage of this act the defendant and those under whom it claims had for more than forty years been exercising to its full extent the right which it now claims, and for fifty-five years more had exercised it to only a little less extent. Under the Revised Statutes it had acquired valuable rights, of which by the new enactment it could not justly be deprived. After the passage of the statute, possession could not avail for the acquisition of new rights, but those which were then perfect were not taken away by the enactment. *United States* v. *White*, 2 Hill, (N. Y.) 59. *Battles* v. *Fobes*, 18 Pick. 532. *Wright* v. *Oakley*, 5 Met. 400. *United States* v. *Buford*, 3 Pet. 12. *Davis* v. *Minor*, 1 How. (Miss.) 183. *Stipp* v. *Brown*, 2 Ind. 647. *Knox* v. *Cleveland*, 13 Wis. 245. *Wires* v. *Farr*, 25 Vt. 41. *Woart* v. *Winnick*, 3 N. H. 473.

We have not overlooked the cases in which it is said that no length of time will legalize a nuisance. See *Commmonwealth* v. *Upton*, 6 Gray, 473; *Morton* v. *Moore*, 15 Gray, 573; *New Salem* v. *Eagle Mill*, 138 Mass. 8. The reason of the rule to which these cases refer is, that criminality can gain no toleration in the law. The creation and maintenance of a public nuisance is punishable criminally; hence the element of criminality, which characterizes the act of creating it, should prevent the acquisi-

tion of a right to maintain it. The rule, as sometimes broadly stated, is not of universal application. An adjacent landowner, who erects and maintains a fence along a highway in such a position as to include in his enclosure a part of the highway, may be indicted for maintaining a public nuisance. Yet, by our statutes, if he so maintains it for forty years, he thereby acquires a prescriptive right against the public to have it remain there forever. The same rule applies if the fence is on a town way, private way, training field, burying place, landing place, or other land appropriated for the general use or convenience of the inhabitants of the Commonwealth, or of a county, town, or parish. Pub. Sts. c. 54, § 1. *Cutter* v. *Cambridge*, 6 Allen, 20. *Winslow* v. *Nayson*, 113 Mass. 411, 421. So under the Revised Statutes, c. 119, § 12, (Pub. Sts. c. 196, § 11,) suppose an exclusive occupation by an individual of land held by the Commonwealth for a public use, and a maintenance by him of such a possession as constitutes a disseisin in some way other than by the erection of a fence or a building; such an interference with the rights of the public would be a public nuisance, and subject him to an indictment; yet at the end of twenty years he would have a title by disseisin, and the Commonwealth could not dislodge him.

In the case at bar, the public rights secured by the colonial law are in the nature of ordinary rights of property, whereby the public may use and enjoy this great pond in the same way as a private owner would ordinarily use and enjoy it. The acts of the defendant, and its predecessors in title, have been injurious only as they have interfered with the public in the enjoyment of these rights of property. If they created what was technically a public nuisance, they were not criminal in the sense in which the word is popularly used, and if there was in them any element of criminality it was very small as compared with that involved in the maintenance of a nuisance that endangers the life or health of the people, which is the kind of nuisance on which the rule was founded. Notwithstanding the general language which is used in some of the cases, we do not think that either principle or authority requires the application of this rule to a case where the invasion of the rights of the public is only in regard to their enjoyment of property, in

the way in which a private owner would ordinarily use it, and where there is a statute permitting the acquisition by disseisin of a complete title against the State, and where there is no other nuisance than an abridgment of the ordinary use of the property by the public, by a long continued use of some part of it by an individual under a claim of right. The master does not find that the lowering of the pond has been detrimental to the public health, or in violation of public or private rights, otherwise than as it has for a short time in each year reduced the area and depth of the water, and diminished the enjoyment of boating. This abridgment of public rights appears to have been of but little practical importance, and when we consider the great apparent value of the water for furnishing power to riparian proprietors upon the stream below, and the finding of the master that there are eleven mill sites and privileges on the brook, in which there is an invested capital of about $1,800,000, it does not seem strange that for nearly one hundred and twenty years the water has been used in this way without objection on the part of the Commonwealth.

A majority of the court are of opinion that the defendant has a right to draw the water at the outlet of the pond as it was accustomed to do for more than forty years prior to the change of the law by the enactment of chapter 275 of the statute of 1867.                                        *Information dismissed.*