INHABITANTS OF BROOKLINE *vs.* CHARLES G. MACKINTOSH.

Norfolk.    May 6. — July 5, 1882.

The St. of 1872, c. 343, authorized a town to take, hold and convey, for necessary uses, the waters of a river, to a certain amount daily, and for this purpose to take and hold lands, build reservoirs, aqueducts and dams; and provided that it should pay all damages sustained by any person in his property by such taking of water, or of any land, rights of way, water rights or easements, and that the owner of any property taken as aforesaid, or other person "sustaining damages as aforesaid," should recover damages in a mode pointed out. *Held,* that if a person on the river, above the place where the town took water, had acquired the right to foul the stream, there was no taking by the town of such right by implication.

Since the passage of the St. of 1878, c. 183, forbidding the discharge into any river or stream, used as a source of water supply by any city or town, within twenty miles above the point where such supply is taken, of any sewage, drainage,

refuse or polluting matter of such quality or amount as to be deleterious to health, a person cannot acquire by prescription the right so to foul a stream within such distance, as against a city or town using the stream as its source of water supply.

A town, authorized by statute to take water from a river, acquired land on the bank of the river, and took the water by percolation into a filtering gallery. Four thousand feet above its works, A. carried on the business of wool-pulling, and cast daily into the stream, in the process of such business, animal matter in a state of decomposition, together with a small amount of arsenic. The quantity so cast into the river made no perceptible difference in the quality of the water at the point where the town took its supply, and no trace of arsenic could be there discovered by chemical analysis. If the town should take its water directly from the river, there would be a possibility, especially in times of freshets, that some arsenic would be carried into the water used by the town. A.'s factory was not run to its full extent, and the danger from arsenic would be increased by any increase in the use of the factory. A. could not acquire a prescriptive right to pollute the river. *Held*, that the town could not maintain a bill in equity against A. to restrain him by injunction from continuing his business.

BILL IN EQUITY, filed November 23, 1880, for an injunction to restrain the defendant from corrupting and polluting the waters of Charles River, from which the plaintiff takes water for domestic use by its inhabitants. Hearing before *Soule*, J., who, at the request of the parties, reported the case for the consideration of the full court, in substance as follows:

On May 7, 1872, the plaintiff town accepted the St. of 1872, *c.* 343, and under the authority given by it, by a vote passed on April 22, 1874, a copy of which was duly recorded in the registry of deeds for Norfolk county within sixty days thereafter, declared its intention to take daily from Charles River one million five hundred thousand gallons of water for the supply of its citizens.

In the exercise of its powers under the act, the plaintiff town, in 1873, purchased certain lands in Boston, bounded on Charles River, and extending to the middle thereof; and, at about the same time, took certain other lands adjoining, and bounded by and extending to the middle of the river, for the general purposes of its water supply, and it has ever since been, and still is, in possession of all said lands, which have a frontage of several thousand feet on Charles River, and contain from twenty to thirty acres.

The town does not now obtain water by pumping or by other means directly from the river, but obtains it, and has always

obtained it, by pumping from an underground trench, or filtering gallery, into which the water flows by percolation through the walls of the gallery, chiefly from the landward side, but in part from the river through the natural wall of gravel and other material between the gallery and the stream. A trench opening directly into the river, and running nearly parallel with the gallery, at an average distance of about thirty feet from it, and at the nearest point fifteen feet from it, aids in bringing a supply of water from the river, by lessening the thickness of the intervening wall or filter between the gallery and the water of the stream.

The town uses about one million two hundred thousand to one million four hundred thousand gallons of water daily in the summer season, and about eight hundred thousand gallons daily in the winter season. The flow of the river at a point about four thousand feet above where the gallery is situated, is from nine million to ten million gallons daily.

There is no purpose on the part of the town at present to obtain a supply of water directly from the river, without the intervention of the earth-filter; but it will probably be necessary for it to enlarge its supply by some means within a short time, perhaps within a year or two.

About six weeks before the bill was filed, the defendant began to carry on the business of wool-pulling in a building situated in Dedham, in the county of Norfolk, on the banks of Charles River, at a point about four thousand feet up stream, by the course of the river, from the trench, filtering gallery and pumping station of the plaintiff. He operates on about two hundred sheep-skins or pelts daily, all of which are soaked in vats under the building, into and from which the water of the river flows freely, for one night, after which each skin is treated with a mixture of lime and red arsenic, which is permitted to remain on it for some hours, after which the skin is washed in the vats, into which the mixture of lime and red arsenic, except such small part of it as has been absorbed by the skin, passes and falls to the bottom of the river. About one and one third pounds of red arsenic is used daily. It is a harmless substance, so far as any effect on the water is concerned, if pure; in fact, it is never absolutely pure, but, as bought and sold in commerce, is always

mixed with a small proportion of white arsenic, which is an active poison. In the prosecution of the work of wool-pulling, more or less animal matter, in a state of partial decomposition, either in a solid form or mixed with fluid, is thrown into the river. The quantity is sufficient to defile the water at the factory where the work is done, and make it unfit for domestic use there, but it is not sufficient to produce any perceptible effect on the quality of the water in the river at or opposite to the point where the plaintiff's works are situated.

No trace of arsenic can be discovered by chemical analysis in the water of the river at or opposite to the plaintiff's works. In times of freshet, when the bed of the river is specially disturbed, it would be possible that small quantities of white arsenic might be carried, suspended in the stream, as far down as the plaintiff's filtering gallery, and even farther.

As the plaintiff now obtains its water by filtration into the gallery from which it is pumped, no damage is done by the defendant to the quality of the water which it uses; and no damage is done to the property of the town, either in the value of the land which it purchased, as distinguished from the value of its waterworks, or in the value of the waterworks.

If the plaintiff should obtain its water for use by pumping directly from the stream, without the intervention of a filter, there would be a possibility, especially in times of freshet, that some poisonous arsenic, put into the water by the defendant, would be carried into the water used by the town, but it would necessarily be in very small quantities, suspended in the water.

According to chemical analysis, the water of the river is now of substantially the same quality as it was ascertained to be before the plaintiff decided to take the water under the St. of 1872.

The sewage of several towns is discharged into the river twenty miles above the defendant's factory, but it did not appear that the water of the river opposite the plaintiff's works is injuriously affected thereby. It would not be certain that, because the chemists failed to detect the presence of sewage or decayed animal matter in the water, it was not in fact there.

The capacity of the defendant's factory is about five times the amount of work now done there. The amount of arsenic used,

and of animal matter cast into the stream, would increase in direct proportion with the increase of work done; and the probability of poisonous arsenic being carried into the water used by the plaintiff, if the supply were obtained by pumping directly from the stream, without the intervention of a filter, would be increased in the same proportion.

In the year 1850, one Joseph H. Billings engaged in the business of wool-pulling at a point on the bank of Charles River directly opposite the defendant's factory, and carried it on there till 1859, in substantially the way in which the defendant now carries it on. On August 29, 1859, Billings bought land where the defendant's factory now stands, and there built the factory in a manner specially adapted to the business of wool-pulling, and then made an arrangement with the defendant under which they carried on that business together, till Billings died, in 1874, after which the defendant continued the business, as surviving partner, till 1875, when his brother hired the factory from the administrator of Billings, and continued the business in person till February 1878, when he left the business in charge of his servants, who finished manufacturing the stock on hand in July 1878, after which no work was done there till the defendant began his business in October 1880. When the defendant's brother left the factory, in February 1878, he went into the employ of another, in the same business, in another town, intending to remain with him but a short time, and expecting at some time to resume business at the factory. In June 1878, he bought the factory and land at an administrator's sale, and received a quitclaim deed of it, which has never been recorded. In the summer of 1878, the windows of the factory were broken by trespassers, who did other damage, and carried away all the movable property about the premises; the brother of the defendant boarded up the doors and windows, and it remained unoccupied till September 1880, before which time it had become ruinous, and unfit for use. At that time, he began to repair it, and let it to the defendant.

The defendant has never had a license from the selectmen of Dedham for any of his proceedings. The business done there creates an offensive odor, which is perceptible at times at a distance of half a mile from the factory.

Before the defendant began business, in November 1880, he was notified by the water board of Brookline, that, if he began to wash sheep-skins in the river, an attempt would be made to obtain an injunction against him.

There was no evidence as to who owned the land which the plaintiff town purchased, between 1859 and the time of the purchase, other than the grantors of the town, if anybody, nor whether such owners were or were not persons *sui juris*, nor whether they or the grantors of the town had actual notice of the carrying on of the business by Billings and the defendant, except so far as such knowledge might be inferred from the character of the business, and the fact that it was carried on openly. The judge found that actual knowledge by the owners of the carrying on of the business was not proved; and reserved the question whether, in this state of evidence, there was a presumption of law that such owners had such knowledge.

Such decree was to be entered as to the full court should seem proper.

*M. Williams, Jr. & C. A. Williams*, for the plaintiff.

*A. Churchill & C. A. Mackintosh*, for the defendant.

DEVENS, J. Assuming, but without deciding, that the remedies provided by the St. of 1878, *c.* 183, to prevent the pollution of rivers, streams and ponds, used as sources of water supply by cities or towns, are not exclusive, and that, on a proper case made, the court, under its general chancery jurisdiction, may restrain any nuisance committed by the defendant in fouling the waters of Charles River, we proceed to consider whether such a case is set forth in the report as entitles the plaintiff to the exercise of this jurisdiction.

By the St. of 1872, *c.* 343, the plaintiff was entitled to take, hold and convey, for domestic and other necessary use, one and a half millions of gallons of water daily from Charles River, and also to take and hold, by purchase or otherwise, such lands as might be necessary for obtaining, using, distributing and disposing of said water. It was empowered to build reservoirs, aqueducts and dams, and to regulate the use of the water. By § 6, it was made liable to pay any damages that might be sustained by any person in his property by the taking of the water from the stream, but no liability was imposed

upon it to pay damages to any person whose lawful use of the water, under rights previously acquired by prescription or otherwise, might diminish its purity.* The plaintiff accepted the act, declared its intention to take the water to the extent of the full amount allowed, and obtained by purchase and taking the lands necessary for all the purposes of its water supply along the bank of Charles River, and has erected all necessary structures. The water is not taken directly from the river, but by the intervention of a filtering gallery, into which the water passes by percolation through the walls. This is not the less a taking of the water from the river. *Ætna Mills* v. *Brookline*, 127 Mass. 69. The defendant is pursuing a useful and necessary business, but one which cannot be conducted without the use of water, which, when returned to the stream, is to some extent polluted by his use.

The water is found to be of substantially the same quality, according to chemical analysis, where the plaintiff takes its supply, that it was ascertained to be before the plaintiff decided to take the water under the St. of 1872. As the plaintiff now obtains its water by filtration, no actual damage is done to the quality of the water it uses, and no damage is done to the property of the town, either in the value of its land or waterworks. If the town should hereafter take its water directly from the stream there would be a possibility that some poisonous arsenic, used by the defendant at his works, might possibly be carried, especially during freshets, into the water used by the town, but necessarily in very small quantities suspended in the water.

---

* The language of this section is as follows: " The said town of Brookline shall be liable to pay all damages that shall be sustained by any person or persons in their property, by the taking of the waters of said Charles River, or other source of supply, or any part thereof, as authorized by this act, or by the taking of any land, rights of way, water rights or easements, or by the erection of any dams, or the construction of any aqueducts, reservoirs, water-ways or other works for the purposes of this act; and if the owner or owners of any property which shall be taken as aforesaid, or other person or persons sustaining damages as aforesaid, shall not agree on the damages to be paid therefor, he or they may apply by petition for an assessment of the damages at any time within three years from the taking of the said property, or the construction of dams or other works occasioning damages as aforesaid, and not afterwards, to the Superior Court in the county in which the same are situated."

But there is no present purpose on the part of the town to obtain its supply except through the earth filter.

No present actual damage resulting from any act of the defendant is therefore shown by the plaintiff, but it contends that the sending down of poisonous substances, which, under certain circumstances, might possibly injure the water as used by it, if it should take the water directly from the stream, is an injury to its right thus to take, such as entitles it to an injunction, even if there is no present purpose of exercising this right.

It contends that it obtained a right to take pure water from Charles River; that any use, prescriptive or otherwise, to foul the stream in the exercise of a manufacture was taken by implication, when the town took the waters by eminent domain, and that the owner of the privilege had his remedy therefor in damages. This is not the true construction of the St. of 1872. The town paid for the quantity of water which it took, as it thereby diminished the supply which the mills and other estates on the banks of the river would otherwise receive. General laws had previously been passed as to defiling streams which were the sources of water supply. Gen. Sts. c. 166, § 6. The St. of 1872 provided, in § 13, penalties for injuries to water which had been taken by the town, but an examination shows that this applies to the water after it had been actually taken, and was in its pipes or reservoirs, and not to that which was its source of supply. The protection of this was left to the law as it then existed or as it might afterwards exist. The St. of 1878, c. 183, legislated fully on this subject, providing very efficient remedies for such injuries as would make the water deleterious to the public. While arguments drawn from subsequent legislation are not very forcible, § 3 of that statute not only contemplates that there may exist easements for drainage and discharge of refuse matter, by legislative grant or by prescription, in the streams which are the sources of water supply, but provides that they shall not be destroyed or impaired.

It may be that any use of the waters of a stream, however long continued, is liable to be controlled, impaired or destroyed, if the legislation of the State shall treat the existence of such a use as incompatible with the health, safety and welfare of the community, and that, even if the market value of property is

diminished, no right is violated, as the mode in which property is enjoyed may be subject to the rights of all in their health and safety, and subordinate to general laws established for their protection. *Commonwealth* v. *Upton*, 6 Gray, 473. When a long established use of water in a respectable and necessary business is thus impaired or destroyed by legislation, it will be so clearly by express terms or necessary inference; and, if done for the benefit of others, proper compensation will be made therefor. The town possessed a franchise under the law of the State, which gave it the authority to take a certain quantity of water, together with the land necessary for obtaining and afterwards using it. Proper compensation was provided therefor, but no compensation was provided for rights then lawfully existing in the use of the water not taken. It was for the plaintiff to determine, as it must take subject to all the diminution in purity that might be occasioned by a lawful use of it, whether it was such a stream as answered or could be made to answer the purpose. It could not expect riparian owners to surrender rights therein, unless they were, in the interest of public welfare, by a general law forbidden to exercise them, or unless proper compensation was provided therefor.

The plaintiff is not to be treated as strictly a riparian proprietor. Its rights are derived, not from its ownership or occupancy of the bank, but from the legislation which authorizes it so to own or occupy. It draws the water for other purposes, and in greater quantities, than any such proprietor could do, and for this object only it occupies the bank.

But we may profitably consider what are the rules which have been adopted for the protection of riparian and other rights in real estate by courts of equity, in deciding whether those of the plaintiff are invaded by acts like those of the defendant where no actual existing damage is shown. They will be found to divide themselves into two classes: those where the right invaded arises from contract, and the acts done are a violation of the contract; and those where the acts done are such as would by prescription destroy or diminish the right of the plaintiff, if persisted in or continued.

Where any contract is made of which there is a breach, the law implies at least nominal damage; nor will it make any

difference that the form of the action is in tort, if the right violated lies in contract. Thus, the failure of one to pay immediately a check which it was his duty to pay, entitles the holder to nominal damages, although the check be paid before action. *Marzetti* v. *Williams*, 1 B. & Ad. 415. It is upon this principle that the case of *Peck* v. *Conway*, 119 Mass. 546, rests, which the plaintiff erroneously deems to show that his rights are so invaded that he is entitled to an injunction. If one purchased a lot of land upon the condition that he would not for fifty years erect a house upon it without the assent of his grantor, it would not be an answer to say that no damage was occasioned either to the person or the property of him in whose favor the condition was made; it is for the obligee in the contract to say whether he insisted on its terms. In *Peck* v. *Conway*, *ubi supra*, by a reservation in a deed to B., it was provided that no building was to be erected by the said B., his heirs or assigns on the land conveyed, and the grantee of B. was held bound by this reservation to the holder of the estate for the benefit of which the reservation was made. This class of cases has but a remote bearing, if any, upon a case where the parties are strangers to each other, asserting distinct and adverse rights.

By the other class of cases, it is settled that, when a person is asserting a right which at the time does no damage, but which may operate by long continuance to destroy or diminish the right of the plaintiff, even if that right is not then exercised by the plaintiff and there is no present intention of exercising it, he will be restrained by injunction. *Webb* v. *Portland Manuf. Co.* 3 Sumner, 189. In *Crossley* v. *Lightowler*, L. R. 3 Eq. 279, 298, this reason is distinctly given; and, without commenting upon the cases individually, we find none among those cited by the plaintiff where there was not either a present damage, as by the erection of a permanent structure directly interfering with the plaintiff's rights, or where the acts done by the defendant were not such as, if continued for a sufficiently long period, would interfere with or destroy an admitted right of the plaintiff.

It is important, therefore, to consider whether, if the quantity of refuse or poisonous matter now brought down from the works of the defendant be permitted to continue to be turned into the

river, the defendant will gain any rights as against the plaintiff, should it determine hereafter to take the water directly from the stream.

The plaintiff has made its election to take the water, and also as to the manner of its taking. We assume that its right of choice in the manner in which it shall take the water from the stream is not exhausted, and that hereafter, should it for any reason desire to do so, it may adopt any other reasonable mode of withdrawing the water from the stream. If the defendant by his present conduct will gain any right on his own part which he does not now possess, and which would prevent this, a good reason why he should be now enjoined is afforded.

The defendant has either a good prescriptive right to do what he does, or he has not. If he has such a right, his exercise of it is doing no harm to any rights which may exist in the plaintiff in its future action, and he is acquiring nothing as against the plaintiff which can hereafter inconvenience it. If he has no such right, either because his prescriptive right, if it existed, was taken away by the taking of the water, or because his use is such that it cannot be prescribed for, or because he has not exercised his asserted right adversely for the period of twenty years, he cannot now gain one, since the acts done by him, as the case is stated by the plaintiff, might be deleterious to public health, and are expressly forbidden by the St. of 1878, *c.* 183, §§ 2, 3. From the time this statute went into operation, it impliedly prevented the prescription for such a use in a source of water supply from running. The plaintiff deems that such is not its effect, and that, although an act may be prohibited or punished, it will not prevent an individual from justifying by prescription as against another. But it is not easy to see how rights can be acquired by prescription against any one, by acts done in violation of the absolute prohibition of a public statute. Such acts when expressly prohibited are in their inception and continuance unlawful as against the public authority, and they cannot become lawful as against the individual members of the public, however long they may have been exercised. When the statute forbids anything to be done, the right to do it is not to be granted or acquired. However long a nuisance may have been continued, those affected thereby are entitled to a remedy

to the extent at least to which the acts by which it was continued were forbidden by law. *Mill* v. *Commissioner of New Forest*, 18 C. B. 60. *Rochdale Canal* v. *Radcliffe*, 18 Q. B. 287. *Staffordshire & Worcestershire Canal* v. *Birmingham Canal*, L. R. 1 H. L. 254. *Rhodes* v. *Whitehead*, 27 Texas, 304. In *Mills* v. *Hall*, 9 Wend. 315, a dam set the water back and rendered it stagnant, thereby causing disease; and it was held that the length of time which it had stood would not prevent its being an actionable nuisance to the extent to which it was indictable, although the plaintiff could not sustain an action for damage done to his land by flowing, as to that extent the owner of the dam had acquired, and could acquire, a right by long user.

But whether an individual could or could not, as against himself, grant a permission to do those acts expressly forbidden by statute, one standing in the position of the plaintiff could not. Prescription assumes that there has been a grant, which by lapse of time has been lost. It necessarily assumes that there is some one having a capacity to grant. No board and no authority exists which has the power under the law to grant the right to corrupt or pollute the quality of the water for domestic uses, or to render it deleterious to health, in streams which are used as sources of supply to cities or towns. The plaintiff has certainly no such power: it is a corporation performing a public duty; the property which it holds is in public trust; it could not, either by express grant, or by submission to user, or by simple neglect, enable a person to complete a title by prescription, when the acts done in the assertion of such a title are prohibited by statute. *Mill* v. *Commissioner of New Forest, Rochdale Canal* v. *Radcliffe*, and *Staffordshire & Worcestershire Canal* v. *Birmingham Canal, ubi supra.*

The acts done by the defendant which corrupt or impair the quality of the water, if done without right after the passage of the St. of 1878, are of this character. The provision in that statute, that prescriptive rights of drainage or discharge are not impaired or destroyed to the extent to which they lawfully exist at the date of the passage of the act, implies that none are to be gained thereafter in streams which are the source of water supply, if deleterious to health. We do not therefore perceive that

any right can be gained against the plaintiff, or that it needs any injunction to protect its right to take the water directly from the stream, or that this right is now invaded.

The plaintiff contends that the St. of 1878, *c.* 183, in prohibiting drainage or refuse matter from being put into the river so as to corrupt or impair the quality of water, makes it an offence to do so not only where the water supply is taken, but also at or near the factory, and that the evidence shows that the water is there corrupted. Even if this construction is correct, which we do not decide, the plaintiff cannot ask an injunction on that account, as such corruption at that place would not be an injury to it as a private nuisance, even if it might be to others, or even if, as a public nuisance, it is remediable by indictment.

Nor should an injunction be granted on account of any danger that the works of the defendant may be increased, and then injury be done to the water where the plaintiff receives it, or that injury may be now done which cannot be proved by analysis, or that hereafter in the near future the plaintiff may wish to increase its supply of water. Apprehended danger is indeed a ground for issuing an injunction, but it must be apprehended upon a state of facts which show it to be real and immediate.

We have preferred to dispose of the case upon the facts as they are now presented, without discussing the inquiry whether, since the St. of 1878, *c.* 183, the present is the proper form of remedy, or considering many other important questions ably argued by counsel on both sides. Should hereafter a different state of facts be shown in evidence and brought before the court, it may be necessary to consider them. Upon the facts as they now appear, the                    *Bill must be dismissed.*