THE NEWARK AQUEDUCT BOARD

*v.*

THE CITY OF PASSAIC et al.

A corporation called The Newark Aqueduct Company was authorized by statute to use springs "and other sources of water," to supply the inhabitants of Newark with water, and to take such sources of water-supply by condemnation. In 1860, the city of Newark was empowered, by act of the legislature, to purchase the property of The Newark Aqueduct Company, and to make use of its sources of water-supply and "any other sources," taking by condemnation, if necessary. The complainant, The Newark Aqueduct Board, is a public body charged with the management of Newark's water-supply, and is empowered by statute to maintain suits in equity or at law "for any injury or trespass, or nuisance done or caused, or procured to be done to the water-courses, pipes, machinery, or any apparatus belonging to or connected with any part of the works, or for any improper use or waste of the water." In 1867 the complainant purchased for the city of Newark land bordering upon the Passaic river, a tidal stream, and upon the land thus purchased constructed a pumping-station, and, abandoning all other sources of water-supply, for several years has taken large quantities of water, for domestic and other uses by the inhabitants of Newark, from the Passaic river. The city of Passaic, situate upon the same river, about four miles above the complainant's pumping-station, proposes to discharge its main sewer into the tidal water of the river. The complainant alleges that such discharge will materially pollute the water of the river, and thereby create a nuisance injurious to it, and by bill in its own name and behalf seeks an injunction to restrain the proposed discharge of sewage.—*Held*, (1) That the water of the Passaic river, where the tide ebbs and flows, belongs to the State, for uses common to all its citizens; (2) that the city of Newark has no special rights in that water, either by reason of its riparian ownership on the river, or by grant from the State, which may be injured by the apprehended nuisance, and enable the complainant, by showing an apprehended injury, distinct from that which will be suffered by the other inhabitants of this State, to maintain its individual suit to restrain

the nuisance; (3) that, at best, such special rights have not been established by adjudication in this State; (4) that the complainant is not in position to ask for a preliminary injunction when the right on which it founds its claim is, as a matter of law, unsettled; (5) that the proceeding in equity to restrain a public nuisance, is by information by the attorney-general; (6) that the statutory authority to the complainant to maintain a suit in equity for nuisance to water-courses connected with its works, did not constitute it a public agent to sue to restrain a public nuisance, but merely clothed it with power to sue, as an individual might, for the protection of private property; (7) that an injunction to restrain a nuisance will issue only in cases where the fact of nuisance is made out upon determinate and satisfactory evidence, and that, if the evidence be conflicting, and the injury be doubtful, that will constitute a ground for withholding the injunction. And if the nuisance be merely apprehended, it must appear that the apprehension of material and irreparable injury is well grounded upon a state of facts which shows the danger to be real and immediate; (8) that such conditions of fact do not appear in this case.

On order to show cause why an injunction shall not issue to restrain the defendant from discharging proposed sewers into the Passaic river.

Mr. E. L. Price and Mr. Thomas N. McCarter, for the order.

Mr. C. P. Rust and Mr. J. W. Griggs, contra.

The Chancellor.

The complainant is a corporate body composed of commissioners who are from time to time elected by the legal voters of the city of Newark, and is charged, by statute, with the control and management of the supply of "pure and wholesome water" for that city. Among other powers conferred upon it, is authority to maintain a suit at law or in equity for injury, trespass or nuisance to water-courses and apparatus connected with the water-works which are confided to its care. *P. L. of 1860 p. 442.*

By an act of the legislature, passed in the year 1800, a corporation known as The Newark Aqueduct Company was incorporated by the name of "The President and Directors of the Newark Aqueduct Company," for the purpose of furnishing water to the inhabitants of Newark, and was empowered to make

use of any spring or springs that it might think necessary to use for the purpose of obtaining a supply of water.  *P. L. of 1800 p. 10.*

By a supplement to that act of incorporation, which was approved February 17th, 1857 (*P. L. of 1857 p. 19*), it was recited that the city of Newark was rapidly increasing in population, and that many additional springs and " other sources of water " were to be found in the vicinity of Newark which could be made available by the company, but which the company could not purchase through " private negotiations," and power was therefore given it to search for water and to take by condemnation.

By the act of the legislature, approved March 20th, 1860 (*P. L. of 1860 p. 442*), above referred to, the city of Newark was authorized to buy the property of the Aqueduct company, and thereafter to take sufficient water to supply the city of Newark from the sources of supply which the Aqueduct company then used or was empowered to use, and " from any other sources." And, in order to make other sources of water-supply available, a method of condemning water-rights was provided.

In pursuance of the authority thus conferred " The Mayor and Common Council of the City of Newark " purchased the plant of the Aqueduct company.

In 1867 the population of Newark had so largely increased, and the demand for a greater supply of water had become so urgent, that the complainant purchased about twelve acres of land, having a frontage of about two thousand feet upon the west bank of the Passaic river, about a mile above the village of Belleville, upon which, at considerable cost, it caused a pumping-station to be built, from which water has since been pumped from the Passaic river to a large receiving reservoir constructed upon high ground about a mile from the pumping-station, and from thence distributed to the city of Newark, two miles distant, and to adjoining towns, for domestic and other uses.

In 1869, after the completion of the pumping-station and the receiving reservoir, all sources of water-supply, other than the Passaic river, were abandoned.  In the acquisition of this plant the city of Newark expended upward of a million dollars.  The

water it takes from the river averages thirteen millions of gallons daily, and is distributed to nearly two hundred thousand persons, who, by paying water-rates, confer a large revenue to the maintenance of the water-works and the payment of the interest upon bonds that were issued by the city of Newark for their construction.

The tide ebbs and flows in the Passaic river at the point at which Newark's supply of water is taken, and for a distance of about five miles above that point and one mile above the city of Passaic, and within the same limits, the river is in fact navigable.

The city of Passaic, having a population of upwards of ten thousand persons, is situated upon the west bank of the river, four miles above the intake of the water for Newark. It was incorporated in 1873 (*P. L. of 1873 p. 484*), and in 1875 (*P. L. of 1875 p. 570*) was authorized to cause sewers and drains to be constructed in any part of the city. In pursuance of this power it has lately, against the complainant's protest, contracted with the other defendants herein to construct a main sewer with several lateral sewers emptying into it, and to so build the main sewer that its contents will be discharged into the Passaic river. The plans for the proposed construction contemplate sewers aggregating three thousand six hundred and fifty feet in length and the drainage of one hundred and ten dwelling-houses containing one thousand one hundred and twenty-six inhabitants, shops, stores and manufactories in which one hundred and thirteen people are employed, and a public school attended by about four hundred pupils. The portion of the city in which these drains are to be located is rapidly building up and increasing in population. The sewers will not receive the surface or rain-water, but will be cleared by means of flush-tanks, and, as it is estimated, will daily discharge into the Passaic river sixty thousand gallons of filth from privies, sinks and factories. Health statistics exhibit that during the past year twenty per cent. of the deaths in Passaic were caused by typhoid and scarlet fever, diphtheria, cholera infantum and dysentery, and it is insisted that the foul excreta of patients suffering with those diseases will be carried into the Passaic river through the proposed sewers, and

therefrom germs of those diseases will be pumped to the complainant's distributing reservoir and be distributed to a large population, endangering its health. To secure the prohibition of the proposed discharge of these sewers into the Passaic river is the object of this suit.

The complainant takes the position, in the first place, that the proposed sewage will pollute the waters that it supplies to Newark and other municipalities, and will thereby create a nuisance especially injurious to the complainant. And, in the second place, if it should be determined that the complainant will not sustain a special and distinct injury, that it is, nevertheless, empowered by special statutory authority to maintain this suit, if injury will result to it at all, though it be merely in common with the remainder of the public. To this the defendants reply—*First,* that the complainant has no right in the waters of the Passaic river which is not common to all citizens of this State, and that an injury to such right cannot result in such a special and peculiar injury as will enable the complainant to maintain this suit in its own name; *second,* that in absence of such special injury it has no authority to maintain this suit; *third,* that if, under the legislation from which it derives its powers, the complainant has obtained a distinct right to the water of the Passaic, such right does not clearly appear, and should be established at law before the issuance of the injunction sought, and, *fourth,* that in point of fact the proposed discharge of the sewage will not pollute or otherwise injuriously affect the waters of the Passaic at the Newark intake.

It is well established that the title to navigable tide-water and to lands under navigable tide-water is in the State for the support of rights therein which are common to the entire public, such as the rights of navigation and fishing. Without express grant from the sovereign, no individual can obtain special rights in either the water itself or in the land under it. Riparian owners have no special rights in navigable streams in which the tide ebbs and flows by reason of adjacency to such stream, other than alluvion and dereliction. The rights common to the public are enjoyed by the riparian owner in common with others. All

that he gains by adjacency to the water, in addition to the contingent rights by alluvion and dereliction, is convenience in the enjoyment of the common rights.    *Stevens* v. *Paterson and Newark R. R. Co., 5 Vr. 532.*

The rule is different with respect to the riparian owner on a navigable stream in which the tide does not ebb and flow. There his title extends to the land under water to the middle of the stream and to such use of the water as will not work injury to the rights of other riparian owners, or be materially detrimental to the public easement of navigation.    *Attorney-General* v. *Delaware and Bound Brook R. R. Co., 12 C. E. Gr. 1, 8, 631, 638;* Cobb v. *Davenport, 3 Vr. 369.*

As the Passaic river at Newark's water intake is a tidal stream, that city has no special right in the water of the river in virtue of its riparian ownership, nor can I see how it can claim such right under the legislation to which I have referred.    It is obvious that the legislature had in view the taking of water-sources by condemnation, and that it did not contemplate a grant of any part of the public domain.    The act of 1800 authorizes the use of springs by the Aqueduct company.    The act of 1857 extended the company's power of condemnation to additional springs and "other sources," and the act of 1860 gave similar powers to the complainant respecting all sources of its water-supply.    No words indicative of an intention to grant public rights were used.    The rule is well settled that general and indefinite words in a statute will not pass any prerogative, right, title or interest of the sovereign.    In the *Trustees of Public Schools* v. *City of Trenton, 3 Stew. Eq. 667, 683,* Mr. Justice Depue says: "The common-law doctrine is, that where the king has any prerogative, right, title or interest, and the statute is general, he shall not be barred of them by the general words of the act, for the king shall not be bound unless the statute is made by express words to extend to him.  *Magdalen College Case, 11 Co. 74; Plowd. 239; Bac. Abr. tit. "Statutes," (E).*    Independently of any doctrine founded on the notion of prerogative, the same construction ought to prevail founded upon the legislative intent. Where the government is not expressly, or by necessary impli-

cation, included, it ought to be clear from the nature of the mischiefs to be reached, or the language used, that the government itself was in contemplation of the legislature, before a court of law would be authorized to put a construction on a statute which would affect its rights." The same judge, in his charge to the jury, in *Stevens* v. *Paterson and Newark R. R. Co.*, as reported in *5 Vr. 532, 534,* made use of this language : "The distinction between the grant of a mere franchise and a grant of a portion of the public domain is broadly marked. With respect to the latter, the rule is invariably adhered to, that in cases of doubt, the grant is to be construed in favor of the State, and most strongly against the grantee, who will take nothing not clearly given him by the grant.  \*   \*   \*   An intent to alienate any portion of them without any consideration, will not, in the absence of a formal grant in express words, be implied, except upon the clearest necessity to effectuate the purpose of the legislature in investing the grantee with public franchises." In the same case in the court of errors and appeals (*5 Vr. 553*), Chief-Justice Beasley says : "The State is never presumed to have parted with any part of its property, in the absence of conclusive proof of an intention to do so.   Such proof must exist, either in express terms or in necessary implications.   I shall not cite authorities to sustain so familiar a proposition." See, also, *State* v. *Bentley, 3 Zab. 532 ; Proprietors of Bridges* v. *Hoboken Land and Improvement Co., 2 Beas. 81 ; Jersey City* v. *Hudson City, 2 Beas. 420 ; Townsend* v. *Brown, 4 Zab. 80; Morris Canal and Banking Co.* v. *Central R. R. Co., 1 C. E. Gr. 419, 436 ; Endl. Int. Stat. § 354.*

Although it may be proper in some measure to relax the strict application of this rule in the case of a public body created essentially for a public purpose, like that of the complainant before me, yet, even there, there must be some manifestation of the legislative intent to grant public rights. I have been referred to other legislation, having for its object the prevention of the pollution of the waters of the Passaic within the boundaries of the counties of Essex and Hudson (*P. L. of 1873 p. 683*), as indicative of legislative recognition of right in the complainant to

take water from the Passaic where the tide ebbs and flows, but in view of the fact that, previous to that legislation, the legislature expressly authorized the city of Jersey City (*P. L. of 1852 p. 419*), and the Harrison Aqueduct Company (*P. L. of 1864 p. 754*), and possibly other corporations, to take the Passaic water at the locality indicated, the legislation referred to may properly be regarded as relating to protection of the rights thus given; at all events there is nothing in it to satisfy me that it should influence the construction of the complainant's rights as here contended for.

It is not necessary to determine what right, if any, the complainant may have in common with the public to take water from the Passaic for the uses to which it devotes it. If such a right is enjoyed, it is a common right, the interference with which by pollution of the water does not work a private, direct and material damage to the complainant distinct from that which is suffered by the public at large, and which is necessary to enable an individual to maintain such a bill as that which is before me. It is true the injury to the complainant may be greater than to others of the public, because the complainant makes extensive use of the water for purposes which will not admit of its pollution, while others may make but little similar use of it, and others yet may not use it at all. But the injury to all is in its character and essence the same, the difference is only in degree. In the absence of a distinct injury to the complainant, it cannot maintain this suit. Where a nuisance is purely public, the proceeding in this court to restrain it must be by information by the attorney-general. The statutory authority, under which it is insisted the complainant may maintain this suit, is contained in the sixth section of the act of 1860 above referred to. That section provides " that The Newark Aqueduct Board " may prosecute an action or process at law or in equity against any person for money, for the use of water, for the breach of any contract, " and also for any injury, or trespass, or nuisance done or caused or procured to be done to the water-courses, pipes, machinery or any apparatus belonging to or connected with any part of the works, or for any improper

use or waste of the water." As the control and management of all that pertains to Newark's water-supply was committed to the complainant board, it became convenient and proper that it should be enabled to make contracts and enforce compliance with them, and at the same time to protect the property placed in its charge. For these purposes it was given a corporate name and existence, but I find nothing in this legislation which clothes the complainant with power to do more than an individual could do in the protection of his own property. It does not authorize proceedings either in the name of the State or in the name of the attorney-general. The injury contemplated was evidently injury to private rights only. It was to apparatus, pipes, machinery and water-courses connected with the complainant's works, that is, injury to water-courses in which the complainant's principal had some special right of property.

The legislation evidently was designed to bestow a corporate existence upon the Aqueduct board for certain purposes, and, among them, to maintain suits in its own name for the protection of the property entrusted to it, in the same manner as an individual owner of that property might sue for his own protection. The conservation of public interests is with the State and its attorney-general, and its bestowal by the legislature upon another agency, like the grant of public domain, should be by express language, or at least by language from which the power must be necessarily implied.

It follows, from the views that I have taken of the questions thus far considered, that the complainant has not shown either authority to maintain this suit in behalf of the public, or such distinct special rights in the waters of the Passaic river as this court will feel bound to protect, or, at best, that it has not shown such authority and rights established by adjudication in this State. "No rule of equity," says Chief-Justice Beasley, in *Citizens Coach Co.* v. *Camden Horse R. R. Co., 2 Stew. Eq. 299, 304,* "is better settled than the doctrine that a complainant is not in a position to ask for a preliminary injunction when the right on which he founds his claim is as a matter of law unsettled." And in the late case of *Hagerty* v. *Lee, 18 Stew.*

*Eq. 255*, Mr. Justice Depue reiterates the rule thus stated in this language: "It is impossible to emphasize too strongly the rule so often enforced in this court, that a preliminary injunction will not be allowed when either the complainant's right, which he seeks to have protected *in limine* by an interlocutory injunction, is in doubt, or when the injury which may result from an invasion of that right is not irreparable."

It has been urged that the consequences of the contemplated drainage will be so disastrous and irreparable that I should not dismiss this application without considering its merits and giving some expression of opinion as to them.

It is a well-settled rule of equity procedure that an injunction to restrain a nuisance will issue only in cases where the fact of nuisance is made out upon determinate and satisfactory evidence. If the evidence be conflicting, and the injury be doubtful, that will constitute a ground for withholding the injunction. *2 Story Eq. Jur.* § *924 a; Attorney-General* v. *Heishon, 3 C. E. Gr. 410.* And where the interposition by injunction is sought to restrain that which it is apprehended will create a nuisance, the proofs must show that the apprehension of material and irreparable injury is well grounded upon a state of facts which show the danger to be real and immediate. *Brookline* v. *Mackintosh, 133 Mass. 215.*

The complainant grounds its apprehension of danger from the defendant's sewage if discharged into the river, largely upon the opinion of Peter T. Austen, who is employed by it as its chemist, and who is also a professor of chemistry in Rutgers College, at New Brunswick, in this State. This gentleman, assuming that both floating and dissolved matter discharged into the Passaic river will reach the Newark water intake within a few hours after its discharge and be pumped into the reservoir and distributed to the people of Newark, proceeds to discuss the effect of the use of such polluted water upon the health of its consumers. He says:

"Experimental science has established the fact that a large number of diseases are communicated from one person to another by means of minute organisms known as microbes, bacteria, baccilli, microcci, *et cætera,* or more

popularly as germs. The communicability of disease, as in cases of small-pox, scarlet fever, diphtheria, syphilis &c., is well understood by the public. The germs or virus of these diseases come in contact with the proper membranes, and proceed at once to develop and cause the specific functional disorders known as disease. There is good evidence to show that disease may also be communicated by water if the water contains disease-germs."

The affiant then refers to instances in which the prevalence of typhoid fever in a community was attributed to the excreta of the typhoid fever patient in water from which the inhabitants drank. He thinks that the albumenoid matter in sewage, in sufficient quantity and under favorable circumstances, will feed disease-germs and multiply them, and that the putrefaction and decomposition of the albumenoid substances may produce poisonous nitrogenous substances deleterious to health. He further stated that, although a portion of the solid matter in sewage may sink to the bottom or become entangled with the vegetation on the banks of the river, the soluble matter will still pass on, and the solid matter that sinks or becomes entangled may soon ferment, putrefy and decompose and impart to the water its products, and that in process of decomposition gases will be generated which will cause the solid matter that contains them to float with the current.

In addition to this affidavit, the complainant produced the depositions of Charles Jacobson, its civil engineer, and two of its water inspectors, which show that in October, 1888, Mr. Jacobson, accompanied by the two inspectors, went to a point in the Passaic river at about the place where the defendant proposes to discharge its main sewer, at a time when the tide in the river was at full ebb flow, and the volume and current was about the average, and when little or no wind was blowing, and placed four tin floats in the water and then followed them in their course down the stream. Three of the floats became entangled in grass along the shore of the river, but the fourth went to the intake of the water for Newark, a distance of about twenty-four thousand three hundred feet, in four hours and two minutes.

In reply to the affidavit of Professor Austen, and in support of the answer's denial that the discharge of its sewage will pol-

lute the waters of the Passaic river or create a nuisance therein, the defendant produced the deposition of Henry Wurts, formerly State chemist of New Jersey. Mr. Wurts states that he is by profession a chemist, and that for the last seventeen or eighteen years he has made special study of the waters of the Passaic river and many analyses of them. Speaking of such analyses made by him in 1881 and 1882, he says:

"These analyses were so planned as to follow up the changes that might take place in the composition of the river from above Passaic falls down to the outlet of the Dundee canal into the tidal channel at Passaic, showing the effect on the sewage of Paterson of flow through the open air. Above the falls, the total amount of nitrogen in the water in all forms by three analyses made at intervals of some weeks, were $\frac{217}{10000}$, $\frac{286}{10000}$ and $\frac{389}{10000}$, and in the mean $\frac{297}{10000}$ grains per gallon, while at four and a half miles below the falls, at the Broadway bridge, the figures were $\frac{25}{1000}$, $\frac{315}{10000}$ and $\frac{333}{10000}$, in the mean $\frac{309}{1000}$, only four per cent. more than above the falls. Thus, in this four and a half miles of flow almost the whole effect of the sewage of Paterson (then having at least fifty thousand people) had disappeared. This is an absolute loss and destruction of the noxious matter, as these impurities must pass off into the air as ammonia and gaseous nitrogen. Even such portion of it as is assimilated by plants and animals living in the water becomes thereby innocuous, and ultimately passes into the air in these same gaseous forms."

The affiant declares it to be his opinion, substantiated by the result of his analyses, that the nitrogenous and putrescible constitutents of the sewage of the city of Passaic will substantially vanish during the down flow of four and a half miles from the sewer outlet to the Newark intake. He also states that, on the 25th of April, 1889, he examined the sewers of the city of Newark that empty into the Passaic river, and found that they number seven, and that the nearest of them to the Newark water intake is that which is called Second river, two and a quarter miles below the pumping station. At the foot of Clay street he found two brick tunnels discharging directly into the river "streams of black opaque water," having a thick offensive looking scum upon it. This sewer is three and a quarter miles below the water intake, and discharges about two millions of gallons of sewage during the twelve business hours of each day. He further states that the tide in the river carries a portion of this

Newark Aqueduct Board v. Passaic.

sewage to the Newark intake, and that his analyses establish that seventeen-eighteenths of the present pollution of the water at that intake is caused by the Newark sewage. It is also shown that at the defendants' proposed sewer outlet the Passaic river is about two hundred feet wide, and fourteen feet deep in the channel, at high tide, and that, because the United States government has removed the bars in the river, the sewage will be swept back and forth by the continual ebb and flow of the tide, and that the tide flows above the outlet of the sewer for a mile and a half, at the end of that distance rising about three and a half feet. It is argued that the flow of each tide will send the sewage back this distance diluted in a great body of water, and that the greater part of it will thus be obliged to traverse a much greater distance than four and a half miles before it can reach the Newark intake, and it is insisted that, if the Paterson sewage from fifty thousand population disappears in a flow of four and a half miles above tide-water, the sewage in question from only ten thousand population, must more certainly vanish in this greater flow added to a washing by the tide.

In the case of the *Attorney-General* v. *Cockermouth Local Board, L. R. (18 Eq.) 172*, in 1874, I find that Sir George Jessel, M. R., dealt with testimony by Dr. Frankland, of the Royal College of Chemistry, in England, which was somewhat similar to that which is here given by Prof. Austen. There, Dr. Frankland said that no sewage could be admitted into a river without deteriorating the quality of the water.

"The deterioration," he said, "for washing and manufacturing purposes may be, as in this case, insignificant or imperceptible; but for drinking and cooking such water becomes dangerous, because, as the river pollution commissioners have shown, the sewage matter is not perceptibly altered in its character by a flow of seven miles and scarcely diminished in quantity. Neither does the failure of chemical analysis to detect any deleterious ingredient indicate that danger is absent, since the nature of the noxious ingredients which propagate small-pox, scarlet fever, typhoid fever or cholera, is unknown, a chemical analysis is therefore powerless to detect these ingredients."

In the case before me, Prof. Austen speaks of these ingredients as germs of disease called microbes, that is, germs so infinitesimal

that they derive their name, microbes, from the powerful glass by the aid of which it is claimed they may be detected.

The theory advanced by Dr. Frankland was contradicted by other experts, and the master of the rolls, because no impurity was detected in the intake of the Workington water-works, declared that a nuisance was not proven.

In *Goldsmid* v. *Tunbridge Wells Improvement Commissioners,* *L. R.* (*1 Ch. App.*) *349,* Lord Justice Turner, referring to the testimony of scientific experts in a case of nuisance, said: "Speaking with all possible respect to the scientific gentlemen who have given their evidence, and as to whom it is but just to say they have dealt with the case most ably and most impartially, I think that in cases of this nature much more weight is due to the facts which are proved than to conclusions drawn from scientific investigations. The conclusions to be drawn from scientific investigations are no doubt in such cases of great value in aid of or in explanation and qualification of the facts which are proved, but in my judgment it is upon the facts which are proved, and not upon conclusions, the court ought in these cases mainly to rely. * * * In my view of the case, therefore, the scientific evidence ought to be considered as secondary only to the evidence as to the facts." This view of scientific evidence in cases of this kind so commends itself to me that I am constrained to be guided by it in the disposition of the question of fact I am now considering. The application here is to restrain that which it is alleged will create a nuisance, not that which in fact creates a nuisance. The injury is prospective, and it is only possible to judge from experience in similar cases, experiment and the opinions of experts, whether the apprehension is well grounded and free from doubt. Here two important circumstances appear: first, practically all traces of the Paterson sewage, as far as the same could be detected by chemical analysis, had disappeared in the flowing water of the Passaic four and a half miles from the place at which it was discharged into the river, although, in that part of the river, there was no flux and reflux of the tide; and second, the sewage of Newark washed by the tide to the Newark water intake, readily detectable by

chemical analysis, has not produced an injury similar to that which is apprehended from this much smaller quantity of sewage, to be emptied into the river at a much greater distance from the intake. In the light of these circumstances it may be asked why, if imperceptible germs of disease, fraught with danger to health and life, continue in water after all .traces of the sewage from which they come, so far as they can be detected by the chemist, are lost, have not their dangerous qualities become manifested in Newark long before this? This experience seems to be a complete negation of the danger theory advanced in support of this application, or is sufficient at least to render it doubtful whether the danger apprehended is more than chimerical. I deem it of sufficient weight to justify me in withholding a preliminary injunction.

I will discharge the order to show cause, and deny the complainant's application.