PROPRIETORS OF MILLS ON MONATIQUOT RIVER & others *vs.* BRAINTREE WATER SUPPLY COMPANY.

Norfolk.   March 26, 1889. — June 20, 1889.

Present: MORTON, C. J., FIELD, DEVENS, W. ALLEN, & HOLMES, JJ.

*Water Company — Ultra Vires — Eminent Domain — Damages — " Springs " — Equity — Injunction — Laches.*

Mill-owners on a stream made necessary reserves of water, under the special act of 1818, c. 35, for the use of their mills in Little Pond, a great pond in the town of B., and drew upon them for nearly sixty-five years. A water company was authorized, by the St. of 1886, c. 269, for the purpose of supplying the town of B. with water, to take land, the waters of another great pond in that and another town, and "the waters of any spring or artesian or driven wells within the town of B. and the water rights connected therewith"; and thereupon, on September 26, 1886, took land near Little Pond and constructed in such land a water gallery, and proceeded to pump from the gallery water which percolated into it from the pond and was intercepted by it on its way to the pond, thus substantially lessening the reserves for the mills. On November 8, 1887, the mill-owners filed a bill in equity to prevent this taking of water from Little Pond. *Held*, that the water company had no right to take the waters of Little Pond. *Held, also*, that the owners were not guilty of laches, and were entitled to an injunction to prevent such diminution of their water supply.

BILL IN EQUITY, filed November 8, 1887, to prevent the taking of the waters of Little Pond, a great pond in Braintree, by the defendant, for a water supply. The case was heard upon the pleadings and the report of a master by *W. Allen*, J., who reported it for the consideration of the full court, and was as follows.

The first named plaintiff was incorporated under the special statute of 1818, c. 35, for the purpose of making reserves of water in various great ponds, among them Little Pond in Braintree, for the benefit of the water privileges on the Monatiquot River. The other plaintiffs were the individual owners of such privileges and the members of the corporation. Little Pond has an area at low water of thirty-nine acres, and at high water of seventy-five acres. In 1823 the plaintiff corporation built, and has since maintained, a dam at the outlet of Little Pond, and raised its waters to high-water mark, making available reserves of water in the pond of about one hundred and ten million

gallons.   It also purchased a parcel of land at the outlet, and cut a canal, following to some extent the original brook, from the pond to the river, and lowered the outlet so that it could control the waters of the pond.   This water had been exclusively used during the past sixty-five years by the plaintiff corporation for the benefit of the mills upon the stream, up to the time of the taking by the defendant, except that wells had been sunk within the water-shed, and water drawn therefrom by certain landowners for domestic purposes and by the town for fire purposes.   The water thus reserved was annually drawn upon for about six weeks in the year, during the dry season, for the use of the mills on the river, and had been used by them among other things for power, for scouring purposes, and for making steam.   The use of this water is so important to the owners of such mills that its diminution would seriously injure them, and its loss might cause some of the mills to stop during a portion of the dry season.

The defendant corporation was established under the special statute of 1886, c. 269, for the purpose of supplying the inhabitants of Braintree with pure water.   On September 24, 1886, the defendant took about two and a half acres of land on the borders of Little Pond, " for the purpose," as recited in the description duly filed by it in the registry of deeds, " of preserving and protecting the rights and water privileges granted to it by legislative action, and for the building of a reservoir or filter gallery, pumping station, and other structures pertaining thereto, and for all other purposes necessary for the establishment and maintenance of complete and effective works-for supplying water to the inhabitants of the town of Braintree."   This land was owned at the time by Nathaniel F. Safford, to whom it was conveyed by a deed purporting to convey to him " the rights of the water and lands of said pond so far as they are adjacent to and appurtenant to said premises."   The defendant thereupon built, at great expense, a pumping station, and a filter gallery about one hundred feet long by fifteen feet wide and sixteen feet deep, on the margin of Little Pond, and of a capacity of two hundred thousand gallons.   At the filing of the bill about one hundred and fifty families and a railroad company were supplied with water by the defendant, to the extent of about

ninety thousand gallons a day; and at the date of the master's report those who were supplied with water had increased to four hundred families and others, besides which the defendant had established one hundred hydrants which the town had used to some extent for fire purposes.

After the bill was filed, on November 26, 1887, the defendant proceeded to take, as recited in the description then filed in the registry of deeds, " all the springs and wells and water rights connected therewith" in the land previously taken by it, on September 24, 1886, for like purposes.   The report of the master recited: " From the situation of the gallery it is plain that, unless the banks of the pond are impervious to water, more or less of it must percolate through the banks into the gallery. The only serious dispute was as to the proportion which came from the pond and from springs respectively, and whether that which came from springs would have found its way to the pond if the gallery had not been made.   Without reciting the evidence, I find the preponderance of it to be that a substantial part — much more than half — of the water in the gallery filters in from the pond; and that all, or nearly all, the remainder would have reached the pond if not intercepted by the gallery. The use of the water during the past season by the defendant diminished the quantity in use for the mills.   The taking from the pond of fifty thousand gallons of water a day would materially diminish the supply for the use of the mills.   The taking of one hundred thousand gallons daily would diminish the capacity of the pond one third, and that of two hundred thousand gallons two thirds.   If the amount of water used by the defendant is increased, a larger proportion will come from the pond than from the land side, and the larger the amount of water used, the greater will be this proportion."   Monatiquot Spring, referred to in the St. of 1886, c. 269, is not within the watershed of Little Pond, but is located in another part of the town.

*E. C. Bumpus*, for the plaintiffs.

*R. M. Morse, Jr. & M. Morton, Jr.*, for the defendant.

1. The right of the defendant to take the waters of Little Pond, or any other waters which may flow into its filter gallery, is clearly given by the act of 1886.   Great Pond is specifically mentioned because it is situated partly in Randolph, and is for

that reason the only source of supply which is designated by name. But with the single exception of Monatiquot Spring, which is not within the water-shed of Little Pond, the purpose of the act is to give the defendant the right to take any waters within the town of Braintree. The term "waters of any spring" is equivalent to "any waters." In *Peck* v. *Clark*, 142 Mass. 436, it was held that even a stream of water running upon the surface of the earth might properly come within the description of a spring. *A fortiori*, the waters issuing into the defendant's gallery by percolation from the surrounding or underlying soil, whether from Little Pond or elsewhere, are springs in the literal and accurate, as well as popular, sense of the word, and were taken by the defendant under the clear authority of its charter. Moreover, the defendant had the right by its charter to take the "water rights" connected with the springs and "easements" necessary for holding and preserving the water, which terms would cover all the interest which the plaintiff might have in Little Pond. As an illustration of the broad construction which the court has put upon acts authorizing the taking of land and water rights to furnish a supply of pure water, see *Martin* v. *Gleason*, 139 Mass. 183.

2. The plaintiffs are not entitled to maintain this suit in equity to restrain the defendant, but should be remitted to an action at law. The plaintiff corporation holds only a revocable license to use the waters of Little Pond without giving any compensation therefor, which license the State might terminate at any time at its pleasure. *Watuppa Reservoir* v. *Fall River*, 147 Mass. 548. *Flax Pond Water Co.* v. *Lynn*, 147 Mass. 31. It could not prevent landowners at any or all points within the limits of the water-shed from sinking wells and drawing water therefrom, as in fact has been done, although such wells might thereby intercept water which would otherwise reach Little Pond. *Greenleaf* v. *Francis*, 18 Pick. 117. *Chase* v. *Silverstone*, 62 Maine, 175. *Ocean Grove* v. *Asbury Park*, 13 Stew. 447. *Bloodgood* v. *Ayers*, 37 Hun, 356. *Chasemore* v. *Richards*, 7 H. L. Cas. 349. Actions of tort have been the usual remedies for unauthorized proceedings for obtaining and furnishing a public water supply. See *Wilson* v. *Lynn*, 119 Mass. 174; *Wamesit Power Co.* v. *Allen*, 120 Mass. 352; *Lund* v. *New Bedford*, 121

Mass. 286 ; *Warren* v. *Spencer Water Co.* 143 Mass. 9 ; *Kenison* v. *Arlington*, 144 Mass. 456 ; *Pickman* v. *Peabody*, 145 Mass. 480. If the defendant is acting *ultra vires*, the proper remedy is by an information brought by the Attorney General. *Attorney General* v. *Jamaica Pond Aqueduct*, 133 Mass. 361. *Hart* v. *Jamaica Pond Aqueduct*, 133 Mass. 488, is distinguishable from the case at bar.

3. It must be conceded that the defendant has established its works in good faith, under a claim of right under its charter, that the plaintiff unnecessarily delayed to bring its bill until after the defendant had incurred large expense, and that an injunction as prayed for by the plaintiff would impose great loss upon the defendant, and would be a serious inconvenience and injury to the inhabitants of Braintree. Under these circumstances the plaintiffs have been guilty of laches, and have lost their rights in equity, if they had any, and must look to their remedy at law. *Fuller* v. *Melrose*, 1 Allen, 166. *Cooper* v. *Hubbuck*, 7 Jur. (N. S.) 457. *Bankart* v. *Houghton*, 27 Beav. 425 ; *S. C.* 28 L. J. Ch. 473. *Birmingham Canal Co.* v. *Lloyd*, 18 Ves. 515. Further, it cannot be denied that money will compensate the plaintiffs fully for any injuries which they may have received.

DEVENS, J. The first question presented by the report is whether the right to take the waters of Little Pond, or the springs which supply it and which are within its water-shed, was granted to the defendant corporation by its charter. This charter was granted by the St. of 1886, c. 269. Section 2 of this act provided that the defendant might take the waters "of Great Pond in the towns of Braintree and Randolph, and the waters of any spring or artesian or driven wells within the town of Braintree, and the water rights connected therewith, except the property known as the Monatiquot Spring, so called, in South Braintree, and also all lands, rights of way, and easements necessary for holding and preserving such water and for conveying the same," etc.

The plaintiff corporation was established by the St. of 1818, c. 35, and was and is composed of the owners of mill privileges on Monatiquot River. As proprietors of mills on Monatiquot River, they were granted "full power, liberty, and authority to

make the reserves of waters wished by them in the following described ponds, or any of them, viz.: . . . the Little Pond, so called, lying in the centre of the town of Braintree, containing about seventy acres." They were authorized in their corporate capacity to erect suitable dams for said purpose, to preserve them so as to raise the waters in said ponds as high as their original bounds, to lower the outlets, and to draw off such portions of said waters as from time to time they might think best. The plaintiffs under this authority have used Little Pond as a reservoir by maintaining a dam at its outlet, where they own a parcel of land, whereby the water is retained until they have occasion to draw off the same for the use of their mills. For about six weeks in the year, the water is of great importance to them. If deprived of it, it might be necessary to stop some of their mills during a portion of the summer, and its diminution would seriously injure them all.

Upon the shore of Little Pond, and near it, the defendant has constructed and maintains a filter gallery, from which it draws water with which it supplies its customers, and it is found " that a substantial part — much more than half — of the water in the gallery filters in from the pond; and that all, or nearly all, the remainder would have reached the pond if not intercepted by the gallery. The use of the water during the past season by the defendants diminished the quantity in use for the mills." It also appears, that, " if the amount of water used by the defendant is increased, a larger proportion will come from the pond than from the land side, and the larger the amount of water used, the greater will be this proportion." It is the contention of the defendant, that the words " spring " and " water rights connected therewith " are sufficiently comprehensive to include this pond, and that the act gave the right to take any waters in the town of Braintree with the exception of Monatiquot Spring, which is not within the water-shed of Little Pond, leaving to the plaintiffs their statutory right to compensation therefor, if they are entitled to any.

But a pond is quite distinguishable from the various sources of supply, whether those are the surface waters, or brooks or springs which create and maintain it. When so large as to have become what is known as a great pond, it is subjected to all the

rights which the public possess, or which the Legislature may be entitled to grant therein. The fact that the act under which the defendant claims specifies Great Pond, so called, as one which may be taken, strongly indicates that the right to take other ponds of that class was not conferred. "Spring," as the word is generally used, means the source of supply issuing from the earth, or found therein by digging or otherwise opening it, and "the water rights connected therewith" are those bubbling up therewith or flowing therefrom. While in *Peck* v. *Clark*, 142 Mass. 436, it was held that a stream of water whose source was on the adjoining land might pass by a conveyance as a spring, it was so because the evidence showed that this was what the parties had sought to describe, and that the word had been used by them with reference thereto.

If the water cannot be taken directly from Little Pond, it cannot be drawn therefrom by percolation. *Hart* v. *Jamaica Pond Aqueduct*, 133 Mass. 488. The process by which the defendant obtains it is unimportant, and this method is one well known and often found convenient. It has often been held to be as complete a taking of water as the withdrawal of it by pipes. *Brookline* v. *Mackintosh*, 133 Mass. 215. *Cowdrey* v. *Woburn*, 136 Mass. 409. The water gallery, as described, is not intended to gather alone the water naturally upon or belonging to the land where it is; but, being located on the shore, the waters of the pond percolate through the intervening earth and fill it. Nor does the fact that the defendant has purchased the land bordering upon the pond authorize it to withdraw the waters thereof for their purposes as a corporation. *Potter* v. *Howe*, 141 Mass. 357. We are therefore of opinion that the defendant is not entitled to take the waters of Little Pond as it now does.

The plaintiffs claim the right not only to the entire waters of the pond, but to those within its water-shed, and urge that the proper construction of the defendant's charter does not authorize it to construct any well or gallery which would intercept any water which otherwise would reach the pond, and that the defendant's right to take any springs is thus limited to those which are outside the water-shed of this pond. This would be to construe the defendant's charter too narrowly. The corporation is created for an important public purpose, and is authorized to

take " the waters of any spring or artesian or driven wells within the town of Braintree," etc.   The reason why we hold that this does not authorize the taking of the waters of Little Pond is, that the water thus collected is known by a different description from those waters which are its sources of supply, but it is contemplated that these may be taken.   It is the right of each landowner to dig wells on his own premises, even if he thereby intercepts the flow of water to his neighbor's well or stream. *Greenleaf* v. *Francis*, 18 Pick. 117.   *Chase* v. *Silverstone*, 62 Maine, 175.   If all that the defendant had done was to construct a gallery which would reach the underground sources of supply alone which were on the land where it was constructed, or even the surface water which might flow thereon, quite a different case would be presented from that which is here found. When the defendant constructed a gallery, the principal use of which was to take water from the pond, which it had no right to do even if it thereby obtained some water which it might lawfully have appropriated, it had not fairly exercised the authority with which it was intrusted, and, independently of any rights which it might have to take the springs, the plaintiffs could fairly ask that it should be enjoined from maintaining it.

If the defendant has no right to take the waters of Little Pond, it is necessary to inquire whether the plaintiffs have any such right therein that they may ask the protection of the court in the enjoyment thereof, as against the defendant, who is supplying water to certain inhabitants for domestic purposes.   It is the contention of the defendant that the plaintiffs had, at most, a revocable license to use and enjoy certain public property, which the State might terminate at any time at its pleasure. *Watuppa Reservoir* v. *Fall River*, 147 Mass. 548.   It is not necessary now to consider whether, under their charter and the acts done under it by them, the plaintiffs have any vested rights in the waters of this pond, or to the use of them, which could be taken away without providing compensation therefor.   There is no controversy here between the plaintiffs and the Commonwealth.   Even if it be conceded that the plaintiffs hold any rights which they may have in the waters subject to the paramount right of the Commonwealth to use the waters for public purposes, or to authorize others so to use it; either with or

without compensation, the plaintiffs have a right to use it a against one to whom this authority has not been granted, in which right they are entitled to be protected.

The plaintiffs have erected and maintained their dams, have had the exclusive control and use of the waters of this pond for sixty-five years, have erected valuable mills which have been of incidental benefit to the community, and have had the advantage during that time of the waters for their mills. Without considering whether this, under all the circumstances, would give more and greater rights, it is sufficient at least to entitle them to the enjoyment thereof as against a corporation acting *ultra vires* in removing this water. Nor is it any answer to say that the defendant is doing a valuable public work in supplying the citizens of Braintree with this water. Its right to take the waters lawfully collected and enjoyed by others is still limited to that which is conferred by its charter.

While actions at law have often been resorted to as a remedy for the wrongful withdrawal of waters, they are not the only remedy. The defendant is doing damage to the mills of the plaintiffs, which can only finally be remedied by injunction. An action at law would compensate the plaintiffs only for the injury which the plaintiffs have already sustained. The provision of the St. of 1886, c. 269, § 4, which permits any party sustaining damages under the act to have the same " assessed and determined in the manner provided by law when land is taken for the laying out of highways," etc., is applicable only to those which are caused by the rightful action of the defendant under its charter.

Nor have the plaintiffs been guilty of such laches as should deprive them of a remedy in equity unless they shall first establish their right at law. The defendant formally took under its charter a parcel of land, which it now owns, and on which it has erected its water gallery, which belonged to one Safford. This was in September, 1886, and it would seem that, as this tract was on the border of the pond, it was deemed by the defendant that it could thus lawfully withdraw the waters of the pond. Safford had no rights other than those of a littoral proprietor, and these gave him no private property in the waters of the pond. *Potter* v. *Howe*, 141 Mass. 357, 359. It was not until

after the bringing of this bill, that the defendant made a formal taking of " all the springs, wells, and water rights connected therewith in the tract or parcel of land " taken. On this latter taking it has been permitted to rely at the hearing, and the effect of it we have necessarily discussed in considering what were its rights acquired under its charter, as by these its powers are defined.

Upon the whole case, we are of opinion that the plaintiffs are entitled to an injunction forbidding the defendant from withdrawing the water from Little Pond, and from using the gallery constructed by it unless the gallery can be so altered that it may be used without producing this result. *Grand Junction Canal Co.* v. *Shugar*, L. R. 6 Ch. 483, 488. *Emporia* v. *Soden*, 25 Kans. 588.                  *Judgment accordingly.*