# Catharine Gring, Appellant, v. Sinking Spring Water Company.

*Waters and watercourses—Springs—Eminent domain—Water companies —Statutes.*

A stream of water, which, after leaving the basin, courses its way in a well-defined channel to a lower level and is large enough in volume to furnish power to run a factory and a mill, may possibly become a private water supply by such appropriation, but the watercourse, whether great or small, is plainly distinguishable both in popular and legal meaning from the source of supply; and a grant or an appropriation of the right to take water from such stream at a designated point, in such a way as not to interfere with the flow of water to that point, is not a grant or appropriation of the spring itself within the meaning of the Act of April 29, 1874, P. L. 93, as amended by the Act of May 16, 1889, P. L.226.

" *Private water supplies* "—*The term defined—Eminent domain.*

Where an actual appropriation and the right to appropriate for a private purpose concur, the water thus appropriated may properly be described as a private water supply; but the mere right which every riparian owner has to use the water of a flowing stream for ordinary purposes is not sufficient to characterize the stream as a private water supply within the meaning of the act.

Where a stream is located upon land wholly within the ownership of one person, it is seriously to be questioned whether it must for this reason and under all circumstances be considered a private water supply and not subject to appropriation by a water company under the act of assembly. This construction, even could it be sustained, cannot be invoked where the

stream crosses a public highway, nor sustained because after crossing the
road it resumes a course again upon land of the owner whence it rose and
flowed till reaching the road and finally disappears in certain pits.  Es-
pecially is it true that it would have been error to have taken the case from
the jury, there being ample evidence to warrant the jury in finding the
fact, that by reason of the erection, by the owner, of a dam and flume, the
great body of the water of the stream, after being used by the owner to
run her mill, flows naturally upon the land of an adjoining owner, in a
channel which has existed long enough to give the owner of the mill, if
not the adjoining owners, a prescriptive right to have it flow in that course.

Argued Nov. 12, 1897.    Appeal No. 37, Oct. T., 1897, by
plaintiff from judgment of C. P. Berks Co. June T., 1895,
No. 53, on verdict for plaintiff.  Before RICE, P. J., REEDER,
ORLADY, SMITH and PORTER, JJ.    Affirmed.

Appeal from viewer's report.    Before ERMENTROUT, P. J.
The facts sufficiently appear in the opinion of the court.
Verdict and judgment for plaintiff for $800.    Plaintiff ap-
pealed.

*Errors assigned* among others was refusing plaintiff's third
point, which point is as follows: 3. The uncontradicted evi-
dence in the case, showing that the water appropriated by the
Sinking Spring Water Company is a private water supply
arising from a spring located wholly on the property of Catha-
rine Gring, the plaintiff, the Sinking Spring Water Company,
the defendant, has no right under the law to enter upon the
plaintiff's lands and to appropriate the waters of the said
spring."

*Wm. Kerper Stevens*, of *Stevens & Stevens*, for appellant.—
The waters appropriated by the defendant company being the
waters of a private spring located wholly on plaintiff's prop-
erty, the defendant had no right to enter thereon and make
the appropriation.

The distinction between a public and private stream was
recognized by Chief Justice PAXSON in Haupt's Appeal, 125
Pa. 211.

The Supreme Court has defined a private stream in the
case of Reynolds v. Com., 93 Pa. 458.

The defendant's right of eminent domain must be construed

strictly, and its power to appropriate water must be limited to that which is expressly granted to it: Com. v. Railway Co., 27 Pa. 339, 351.

*Richmond L. Jones,* for appellee, cited Seamans v. Keystone Water Co., 1 Lack. Jur. 421; Leavenworth v. Prospect Rock Water Co., 8 Kulp, 310.

There is no special virtue in property lines, the size and capacity of the stream is, of course, in all cases of this kind, to be considered: Miller v. Miller, 9 Pa. 74.

OPINION BY RICE, P. J., March 21, 1898:

It appears that a spring of considerable size rises at the upper end of the plaintiff's land, whence the water flows in a well defined channel to a hosiery factory, for which it furnishes the water power, and thence to a pool formed by a dam. From this pool or dam it is conducted by a flume or headrace across a public road to a grist mill located on another lot belonging to the plaintiff, and after being discharged through the tailrace flows in a defined channel to the defendant's property, where it is stored in a reservoir. When the grist mill is not running the overflow of the pool or dam passes under a bridge crossing the public road above mentioned, and then flows a distance of about two hundred and fifty feet to a marshy place upon the plaintiff's land, where it disappears in sink holes, some of the water reaching the defendant's land adjoining by percolation. The petition of the defendant company is not printed in the paper-book, but we learn from the judge's charge, that the company proposes to take the water at the road. This point being below the dam and the head of the flume, the taking will not interfere with any use which the plaintiff makes of the water for manufacturing or domestic purposes.

It does not distinctly appear how long the water has flowed in the manner above described, but some of the witnesses testify to knowledge of the property for periods ranging from twenty to forty years, and none of them speaks of the water having flowed differently within his knowledge.

It is to be observed, further, that, whilst some of the witnesses testify that the natural flow of the water when the mill is not running is across the plaintiff's meadow to the sink holes, none

of them testifies what would be the natural course of the stream if it flowed in its full volume and were unobstructed.

The broad question raised by the assignments of error is, whether the defendant company had power, under its charter, to appropriate the water at the point above indicated, upon making compensation to the owner; or, to be more exact, whether the court ought to have given the jury binding instructions that under all the evidence the company had not such power.

Section 34 of the Act of April 29, 1874, P. L. 93, as amended by the Act of May 16, 1889, P. L. 226, provides that incorporated water companies "shall have power to appropriate so much of the water from the rivers, creeks, canal water rights and easements, within or without the limits of the city, borough or place in which said company may by its charter be located, as may be necessary for its purposes, . . . . provided, that this act shall not apply to private spring or private water supplies."

It is argued that the water from this spring did not form a creek. Webster defines a creek as a small inlet, bay or cove; a recess in the shores of the sea, or of a river; (2) a small river or brook. It has also been defined as a tidal or valley stream between a brook and a river in size. But, in general, statutes are presumed to use words in their popular sense, and it is a matter of common knowledge that streams may be of equal size and yet one be called a creek and the other a brook. There appears to be no definite legal or popular standard of size by which to determine whether the stream is one or the other; and it would be absurd to hold that the right of appropriation under the act is to be determined by the local name which may be given to the stream. Having regard to the purpose of the enactment, and to the comprehensive popular meaning of the word "creek," it seems safe to conclude, that the legislature intended to grant the power to take water from watercourses smaller than rivers, whether locally called brooks or creeks, leaving the restrictions upon the exercise of the power to be expressed in the proviso.

In exempting springs from the operation of the statute the legislature had in view primarily, the water at its point of issue from the earth or the basin of water there formed. "Springs, as the word is generally used, means the source of supply issuing from the earth, or found therein by digging or otherwise

opening it: " Proprietors, etc. v. Braintree Water Supply Co. 149 Mass. 478. In Magoon v. Harris, 46 Vt. 264, a more restricted meaning was given to the word, and it was there held that the grant of the privilege of taking water from "springs" in a certain locality conveyed no right to take it where it does not issue from the earth. While in Peck v. Clark, 142 Mass. 436 it was held that a stream of water whose source was on the adjoining land might pass as a spring, it was so because the evidence showed that this was what the parties had sought to describe, and that the word had been used by them with reference thereto. "A spring gutter on the surface is none the less a watercourse, although it is not equal in volume to a river. Small as it may be, if it have a clear and well defined channel and a regular flow in that channel, it cannot be diverted to the injury of the proprietors below:" Wheatley v. Baugh, 25 Pa. 528. The owner of land upon which a spring issues, creating a stream which flows in a natural channel into and through the lands of others, has no right, by virtue of his ownership of its site, to divert the waters of the spring to another channel; his rights are those of a riparian owner; neither more nor less: Lord v. Water Co., 135 Pa. 122. A stream of water, which, after leaving the basin of a spring, courses its way in a well defined channel to a lower level, and is large enough in volume to furnish power to run a factory and a mill, may, possibly, become a private water supply by such appropriation, but the watercourse, whether great or small, is plainly distinguishable both in popular and in legal meaning from the source of supply. A grant, or an appropriation, of the right to take water from such stream at a designated point, in such a way as not to interfere with the flow of water to that point, is not a grant or an appropriation of the spring itself. If the legislature had intended to exempt from the operation of the statute all streams having their sources in springs, it seems reasonable to suppose that they would have said so in explicit terms, and would not have used a term, which, neither in ordinary speech nor in the adjudicated cases, has been used to describe them. It is not to be supposed that they ignored the plain distinction between a spring and a stream having its source in a spring, and used the former for a comprehensive term to include both.

What is meant by the term "private water supplies" is a

question not so free from difficulty. We may assume that they were inserted in the proviso with the intention to prevent the actual taking of a supply of water obtained by artificial means for a private purpose, as, for example, a well or a reservoir. Whether or not they were used with the intention to prevent a taking which might work consequential injury to such a supply is another question, upon which we are not called to express an opinion. Nor are we to be understood as holding that the supply must necessarily be obtained or stored by artificial means in order to be within the protection of the proviso. Where an actual appropriation, and the right to appropriate for a private purpose, concur, the water thus appropriated may properly be described as a private water supply. But the mere right, which every riparian owner has to use the water of a flowing stream for ordinary purposes, is not sufficient to characterize the stream as a private water supply within the meaning of the act. As was said in Haupt's Appeal, 125 Pa. 211: " There can be no such thing as ownership in flowing water; the riparian owner may use it as it flows; he may dip it up and become the owner by confining it in barrels and tanks, but so long as it flows it is as free to all as the light and air." If the proviso were to be construed to include every stream from which private owners of the riparian lands draw their supply of water it would virtually nullify the grant of power contained in the purview of the act, and one or the other would have to be rejected—a conclusion always to be avoided in the construction of statutes, if possible.

Not less unreasonable is the theory that the terms of the proviso refer to all water supplies which are not public. Creeks flowing over private lands are spoken of as private streams to distinguish them from the principal rivers, which from the earliest history of the commonwealth have been held for the public benefit, without regard to the ebb and flow of the tide. Many individuals may have rights in creeks, but such rights arise solely out of their ownership of the land over or by which they flow, and are purely private in their nature. The public, as such, and independently of an appropriation under the right of eminent domain, have no right to take the water, unless they have access to the stream by means of a public highway. Such streams are not regarded as public water supplies, and yet ex-

press power is given in the enacting clause to appropriate them; hence it is plain that the suggested test for determining the applicability of the proviso is not the true one.

Another suggestion is, that a stream located on land wholly within the ownership of one person must be regarded as a private water supply, and not subject to appropriation under the act. But we question, whether the legislature contemplated such a restriction of the power granted in the enacting clause as would, under all circumstances and without reference to other considerations, prevent the appropriation of water from a creek, merely because the land through which it runs is held by a single owner. For example, would this alone be a conclusive test where the creek empties into a larger stream? We think not. We need not, however, pursue the discussion of a question not distinctly raised by the undisputed facts of the case. For, in the first place, the stream crosses a public highway, which, in view of the principles recognized in Haupt's Appeal, 125 Pa. 211, is a fact of some significance in considering the proposition that the stream must be regarded as the plaintiff's private water supply because it is located wholly on her land. After quoting with approval what was declared in Mayor, etc., v. Commissioners, 7 Pa. 348, and Phila. v. Collins, 68 Pa. 106, with reference to the right of the general public to take water from navigable streams, Chief Justice PAXSON said: " To some extent the same principle may be applied to what may be called a private stream. In the case of a river or public highway all the people have access to it may ride over it, and use the water. Not so with a private stream. In such case no one can use it or take the water except at a public crossing. There the traveller may stop, refresh himself and water his horse; the water has no owner, and he impairs no man's right. But except at public crossings, such as a road or a street, no one but a riparian owner can use the water; not because the latter has any ownership in it, but because the stranger has no right of access to it. There can be no such thing as ownership in flowing water; the riparian owner may use it as it flows; he may dip it up and become the owner by confining it in barrels or tanks, but so long as it flows it is as free to all as the light and air. It follows from what has been said that the dwellers in towns and villages watered by a stream, may use the water

as well as the riparian owner, provided they have access to the stream by means of a public highway." Whatever, therefore, may be said of the plaintiff's riparian rights in the stream, it cannot be asserted that it is at all points within her exclusive dominion.

In the second place, (referring now to the argument based on the assumption that the stream disappears from the surface on the plaintiff's land,) it is to be noticed that this is a limestone region, where, as was said by LEWIS, C. J.: "Streams of great volume and power pursue their subterranean courses for great distances, and then emerge from their caverns, furnishing power for machinery of every description, or supplying towns and settlements with water, for all the purposes of life:" Wheatley v. Baugh, 25 Pa. 528. Whilst it may be, as the plaintiff contends, that, if the dam and flume were removed, the whole body of water would disappear upon the plaintiff's land, and would not again appear upon the surface in a defined channel, yet, as we have before suggested, that fact was not so conclusively established by the evidence adduced on the trial as to warrant the court in declaring, as a legal proposition, that the stream from its source to its end was, in its natural state, a purely private watercourse, in which no one but the owner of the land on which it rises had any right or interest. This being so, we are not called upon to declare what the rights of the lower owner would be if the mill were abandoned. We have to deal with existing conditions, and the fact is—or to speak within bounds, there was ample evidence to warrant a jury in finding the fact—that the great body of the water of the stream, after being used by the plaintiff, flows naturally upon the land of an adjoining owner, in a channel which has existed long enough to give the plaintiff, if not the adjoining owners, a prescriptive right to have it flow in that course. It is only that portion of the water, which the plaintiff does not use and which she has not appropriated to any purpose, that the defendant proposes to take and pay for.

In view of these facts the court would not have been justified in giving the jury binding instructions, that the whole stream, as it flows, is a private water supply within the meaning of the act, or that the taking by the defendant company at the point

heretofore indicated would destroy, injure, or in any way inter-fere with such supply.

All the assignments of error are overruled, and the judgment and proceedings are affirmed.